**124**

JOHNSON & JOHNSON, a corporation,
Plaintiff,

v.

The KENDALL COMPANY, a corporation, Defendant.

No. 55 C 336.

United States District Court
N. D. Illinois, E. D.

March 4, 1963.

Pendleton, Neuman, Seibold & Williams, Thorley von Holst, Sidney Neuman, James R. Dowdall, Robert L. Austin, Chicago, Ill., Benton A. Bull, New Brunswick, N. J., for plaintiff.

Thomas W. Underhill, Boston, Mass., Anderson, Luedeka, Fitch, Even & Tabin and William E. Anderson, Chicago, Ill., for defendant.

ROBSON, District Judge.

By its complaint, filed March 1, 1955, plaintiff, assignee-owner of Patent No. 2,703,083, issued the same day, in application filed January 4, 1955,[1] to William J. Gross, for an "Adhesive Bandage,"[2] charges infringement by defendant. A counterclaim seeks a declaratory judgment of invalidity and noninfringement. Claims 1, 2, 4, 5, 8, 9, 11 and 12 are here involved.[3]

1. The application was a continuation-in-part of the abandoned applications No. 363,991, filed June 25, 1953, and No. 382,414, filed September 25, 1953, each being the joint application of Shelley and Gross. Defendant points out the earlier patent applications of Sellers and Blackford filed March 27, 1953, specific to the use of Mylar for use on any kind of surgical dressing in which it was stated that "the advantages of the invention flow in part from the peculiar combination of sought-for properties enjoyed by the polyester film facing material."

2. The Gross patent quotes the United States Pharmacopoeia definition of an adhesive bandage as "a sterile individual dressing prepared by affixing a plain absorbent compress to a strip of film or fabric coated with a pressure-sensitive adhesive composition. * * *"

3. Plaintiff charges (1) infringement by all of defendant's devices, P. Ex. 10–B, 11,

In a suit in the United States District Court for the Southern District of New York, the same patent in a suit involving Claims 1–3, 9, 11 and 12 was held valid and infringed. (Johnson & Johnson v. C. B. Stenvall, Inc., D.C., 193 F.Supp. 128 (1961)) After perfecting an appeal, there was a settlement of that litigation; licenses were taken and the appeal withdrawn.[4]

The Court concludes that the Gross patent is valid, and the claims in issue are valid and infringed. It further concludes that the declaratory relief defendant seeks by its counterclaim must be denied and the counterclaim dismissed.

Very generally stated, the patented adhesive bandage is composed of a (1) backing[5] on which is placed (2) a tacky, pressure-sensitive adhesive mass. Centered thereon is (3) an absorbent pad, and finally, affixed thereto in intimate contact is (4) a smooth, continuous (imperforate) facing of organic film which is inert[6] to and releasable[7] from the adhesive mass. This facing is aimed at imparting its smooth surface to the adhesive, and excluding all occluded air. Thereby "craters" or air pockets are prevented from forming in the adhesive mass during the required process of sterilization.

An important aspect of the invention is deemed to reside in the fact that the smoothness of the surface of the adhesive mass upon removal of the continuous facing of a kind inert to the adhesive and releasable from the bandage results in instantaneous and complete adhesion of the bandage to the skin with little pressure, whereas prior to this discovery adhesive bandages were faced with crinoline.[8] Upon removal of crinoline the adhesive surface was rough, and some of the crinoline ingredients and its imprint, remained imbedded on the adhesive, both of which conditions resulted in lessened adhesion of the bandage on application to the skin even with moderate pressure. The invention, in part, disclosed that a smooth, adhesive surface adheres far better to the skin than a rough adhesive surface.

The specifications of the patent state that crinoline had been used in the adhesive bandage field for a quarter of a century but there were consumer complaints of the usage because the bandages did not stick properly. The patentee states that:

" * * * Heretofore, the manufacturer * * * had only one means of coping with the problem, namely, to reformulate the composition of his adhesive mass in order to increase its total adhesive power. * * * However, * * * mass formulations for such bandages basically represent precarious compromises between interrelated, often conflicting, and sometimes mutually exclusive requirements."[9]

12, 12A, of Claims 1, 2, 11 and 12; (2) the vinyl faced adhesive bandages, P. Ex. 12A, also infringes Claims 4 and 9; (3) the polyethylene faced adhesive bandages, P. Ex. 10B, infringe Claims 5, and 8.

4. Plaintiff maintains defendant's burden is all the heavier to overcome, the patent's validity having been sustained in the Stenvall case, supra.

5. Woven or nonfibrous material such as extensible vinyl plastic.

6. The film must be inert under conditions of sterilization. "The film should not contain substances that would react chemically with the adhesive mass, nor migratory ingredients, such as migratory plasticizers that would migrate into the adhesive mass to a degree significantly to impair its adhesive property."

7. Without the adhesive mass leaving the backing.

8. Defined by Gross as a heavily starched and dried gauze. There was evidence that a report on the comparative qualities of crinoline and vinyl glass effect, upon adhesive mass ability to adhere that the latter gave instantaneous adhesion and the former showed zero. Gross testified that at the time of his invention there was no adhesive bandage on the market except that faced with crinoline.

9. The specifications state the invention permits the use of different masses even inferior or unacceptable to those required when crinoline was used; the thickness of the mass could be reduced, the thinning of which would tend to minimize the problems of exudation and mass transfer to the skin.

Plaintiff selects Claim 2[10] as typical. It provides:

"An adhesive bandage of the type having a backing with an absorbent pad secured to one face thereof and which presents on said face a coating of normally tacky and pressure-sensitive adhesive extending beyond the edges of said pad to facilitate adhesion to the skin, said adhesive coating being covered by at least one protective facing member adapted to be removed from the bandage prior to its use, the surface of said facing member in contact with the underlying adhesive coating comprising a film of organic material that is substantially inert with respect to said adhesive, said film having a smooth, continuous, imperforate surface maintained in such intimate contact with the underlying adhesive coating over substantially the entire surface thereof as substantially to exclude air pockets and impart to the underlying adhesive coating, at its interface with said facing member, the smooth surface characteristics of said film, said film being releasable by said adhesive, when the facing member is removed, without separating said adhesive coating from said backing and without substantially impairing the smooth surface characteristics of the adhesive coating existing at the interface prior to such removal."

Thus, if the adhesive is too strong it "might hold the imbedded crinoline so tenaciously that the facing members could not be removed without pulling the adhesive mass off the backing." On the other hand, "a soft, highly tacky adhesive mass might adhere so tenaciously to the skin that removal of the bandage was painful" or there might be adherence to the manufacturer's machine, or exudation of the adhesive mass could occur especially during the high temperatures required by sterilization.

The specifications further state that:

"A more particular object is to provide a method and means by which the adhesive bandage manufacturer may achieve the maximum in the ability of his product quickly and reliably to stick to the user's skin."

Also, the patent is devised to permit the manufacturer a far greater latitude in choosing his "mass formulations."

The patentee notes that it is a requirement for an adhesive bandage in this country that it must be "sterile,"[11] and that temperatures required therefor can cause unwanted and detracting changes in the various elements in the bandage, so that another object of the invention is "to provide an adhesive bandage the components of which will undergo sterilizing conditions without impairing or destroying the acceptability or marketability of the product."

10. Claim 4 provides that the facing film be comprised of a vinyl resin film; Claim 5 that it be a polyethylene resin; Claim 8 that the facing member "comprises a film"; Claim 9 that it "comprises a film united to a fibrous backing"; Claim 11 provides for the film being organic material and the said "facing members having finger gripping portions presenting a free surface out of contact with said adhesive to facilitate stripping the facing members from the adhesive without need of touching the absorbent pad or the adhesive * * *"; Claim 12 adds the element that "the facing member * * * comprising a film of organic material that, under sterilizing conditions, is sub-

stantially inert with respect to said adhesive, * * * the entire bandage being capable of withstanding the conditions prevailing during sterilization without substantial impairment of the properties of said adhesive coating when said facing member is removed."

11. "Practical sterilizing conditions require temperatures of at least 120° F. or more in order for the time required for sterilization to be of reasonably short duration. Generally, chemical sterilization may be carried out at temperatures of 140° to 180° F. Steam sterilization, which is still more rigorous, may be carried out at 235° to 250° F."

The specfications demonstrate the efficacy of the invention by stating that an adhesive bandage made as therein described will lift a can[12] "weighing * * * 55 gms." when "touched at room temperature with one half of the adhesive surface freshly exposed from a 3⁄4″ x 3″ adhesive bandage," and "the adhesion will be sufficiently strong" to lift the can "when additional weights are placed inside"—the maximum liftable weight "being between 200 and 400 grams."[13] This, patentee says, is in striking contrast with the bandage which has a crinoline facing as to which "there is little if any instantaneous adhesion between the adhesive mass and the metal, the box cannot usually be lifted even when the box is free of added weights."

Patentee admits that "continuous facing materials of various types, including organic films and metallic foils, have heretofore been suggested in the art," naming some of the patents now asserted by defendant as anticipating.

In detailing the methods of manufacture the patentee teaches pressing the facing sheet into uniformly intimate contact with the adhesive surface over the whole interface so as to exclude occluded air pockets and impart the smooth surface characteristics of the facing to the adhesive. The exclusion of air pockets is desired for two reasons, i. e., to provide the smooth surface on the adhesive for instantaneous adhesion, and to avoid undesirable effects during sterilization.[14] Plaintiff points out that the Gross patent does not specify that the adhesive must be solvent spread or calendered and the patent covers both modes.

The patent specifications state further:

"Suitable facing materials are those which have at least one surface which is smooth and continuous, and constituted of organic material which is substantially inert with respect to the adhesive properties of the mass. In addition to being smooth, the facing surface is preferably glossy since it has been found that such glossy surface, when transferred to the adhesive mass, imparts to the latter superior properties in respect to instantaneous adhesion. * * * The facing should have sufficient * * * tear strength, * * * [and] preferably permeable to facilitate sterilization. * * * "

Where the bandage is to be steam sterilized it is preferable to have the facing formed by casting rather than calendering, which produces internal strains in the material. Patentee specifies that films made of vinyl chloride resins afford suitable facing sheets for purposes of invention, which may consist of copolymers, such as those of vinyl chloride with vinyl acetate, and vinylidene chloride. He states that cellulose acetate is another "particularly good facing material."[15]

12. Like the "boxes commonly used by all U. S. manufacturers for holding adhesive bandages.

13. Richardson testified a crinoline faced adhesive bandage would not reliably lift 50 gram can but when the adhesive mass was smoothed with a flat facing it lifted 150 gram can, and plaintiff's current adhesive bandage lifted 300 gram can.

14. "[A]ny occluded air during sterilization would tend to expand, thereby separating the facing sheet from the adhesive, distorting the facing and backing, 'cratering' the adhesive mass, and making an otherwise unacceptable product. * * * The product thereby obtained has greater dimensional stability and freedom from strain as compared with products in which the facing material is not so intimately secured to the adhesive."

15. Which has the advantage of a low order of force being required for its releasability from the adhesive mass, and when properly plasticized is chemically inert to the adhesive mass. And commercially available cellulose acetate films are extremely smooth and impart this smoothness to the adhesive mass which they face, and sterilization heat causes the adhesive mass to flow into very intimate contact with the film. One such product named is Eastman Kodak Company's "Kodapak IV," a triacetate, possessing excellent heat and dimensional stability. Another film recommended by the patent is sold to the trade under the trade-mark "Mylar," which is a film

Patentee notes that when the adhesive mass is solvent spread rather than calendered, the solvent content is a variable to be controlled since residual solvent in the mass may generate gas bubbles and produce "cratering" during sterilization of the bandage.

■ The defenses asserted are invalidity and noninfringement. Invalidity is predicated on the ground that the four elements of the patent are all old in the art, both individually and in combination, with a mere difference in relationship or change in degree, with no showing of "unusual or surprising consequences from the unification of the elements."[16] (This assertion is in decided contrast to defendant's complimentary sales bulletin dated December 23, 1953).[17] Defendant maintains plaintiff merely speaks of the improvement in result of its product over the *crinoline* prior art, neglecting the more pertinent *continuous facing* prior art, and prior public use.[18] Defendant asserts that neither the Patent Office nor the Court in the Stenvall case, supra, was apprised of the prior commercial public use of smooth, continuous facings such as Holland cloth and polyethylene for adhesive products by both plaintiff and defendant.[19] It con-

having high molecular weight polyester of terephthalic acid and a dihydric alcohol such as ethylene glycol. Still another film is cellophane, i. e., regenerated cellulose. Also named are ureaformaldehyde resin-coated papers, melamine-formaldehyde resin-coated papers and polyethylene-coated papers. Patentee states the release properties of Mylar are improved with sterilization. Mylar and Kodapak did not become available until 1951, defendant states.

16. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 150, 152, 71 S.Ct. 127, 129, 130, 95 L.Ed. 162 (1950); Senco Products, Inc. v. Fastener Corporation et al., 269 F. 2d 33, 34 (C.A.7, 1959). It charges plaintiff with having as "its true purpose of attempting to gather the foam of 'the advancing wave of improvement' in the form of a patent monopoly and 'lay a heavy tax upon the industry' Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 92 [62 S.Ct. 37, 86 L.Ed. 58] (1949)." It asserts that Gross' work "was but the adaptation to the natural development of the art, by those skilled in it, of the scientific knowledge which had been accumulated by investigation and experimentation." Defendant also claims that plaintiff has not sustained its burden of proof of a generic invention of which Gross was the sole and first inventor, claimed with sufficient diligence to be entitled "to any filing date which avoids the intervening bar of defendant's sale of the accused bandages DX 12–A more than *one* year prior to January 4, 1955." (Italics not supplied.) Plaintiff, on the other hand, maintains "the adhesive bandage art was bogged down in the twenty year old tradition of the crinoline bandage and that since his invention came into public knowledge the entire industry switched over to it." Gross is therefore "worthy of all favor." Atlantic Works v. Brady, 107 U.S. 192, 200, 25 S.Ct. 225, 27 L.Ed. 438. Plaintiff claims it made a "resounding impact upon the industry."

17. "We have now changed over all Canadian production on Curad Plastic Bandages to a paper facing. This results in a very smooth mass which when applied to a smooth surface gives 100% contact immediately. This improves the initial grab quality of the product immeasurably. Through the use of a paper facing we also eliminate the starchy film increasing the initial grab of the adhesive mass. * * *"

18. Plaintiff, however, claims that the critical arrangement of the Gross elements filled a longfelt want which the adhesive bandage industry had never been taught. (Ray-O-Vac Co. v. Goodyear Tire & Rubber Co., 136 F.2d 159 (C.A.7, 1943), aff'd. 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721; Blaw-Knox Company v. I. D. Lain Company, 230 F.2d 373 (C.A.7, 1956).
Plaintiff, however, maintains (a) "[D]efendant itself has always recognized that the crinoline faced bandage was the only pertinent standard of comparison and, (b) it is physically impossible to compare something with nothing, i. e., Gross' bandage with hypothetical or inoperative non-crinoline bandages." Thus it cites defendant's researcher's (Bowen's) reference comparing its Curad tape faced with Munising Holland with crinoline facing, Crinoline facing constituted 99% of the prior art market.

19. Plaintiff points out that Holland cloth facing of alleged prior public use and sale was not in intimate contact with

tends that Gross did not himself invent the subject matter of the patent in suit as required by the statute (35 U.S.C. § 102(e)), but it was known, used and patented by others (35 U.S.C. § 102(a)). It challenges the Stenvall case, supra, finding as unsupportable on the present record proving commercially sold surgical and industrial adhesive products having continuous, smooth, inert and removable facings. The defendant cites the "proved public sales of the Cress bandages,[20] which substituted a smooth, continuous facing for crinoline, well before plaintiff's * * * commercial substitution,"[21] and that the judge in the Stenvall case, supra, was misled into believing there was no commercial use of continuous faced bandages prior to the Gross patent. It asserts that production of adhesive bandages using old facing materials broadly claimed in plaintiff's patent was not unobvious; that the invention resides in the discoverer of the facing material, Mylar.

Defendant denies infringement by its CURAD adhesive bandage, which utilizes a facing of either a Munising Company 842–C1S steam-sterilizable vinyl coated impregnated paper,[22] as exemplified in PX 12–A and a transparent elastic unsupported polyethylene film, made by defendant under its own patent, not steam-sterilizable. It states plaintiff was aware of Mylar's qualities as a release material against pressure-sensitive adhesives in 1951 by reason of its sale of Mylar-backed pressure-sensitive adhesive tape in roll form.[23] Defendant states it does not use the Mylar or cellulose triacetate constituents but uses an unsupported polyethylene film. It points out that as late as June, 1953, plaintiff's research department reported that polyethylene film of 3.5 mils thickness was " 'too stretchy and flimsy' " for a bandage facing.

Defendant challenges Judge Solomon's finding that there was " 'a widespread belief that the rough surface in the adhesive mass caused by the crinoline facing afforded greater opportunity for adhesion to the skin' " citing an article by an employee[24] of plaintiff published in

the adhesive and when removed left the adhesive rough. The cited Double Seal Wet-Pruf tape though long made did not teach defendant how to make the present adhesive bandages. The cited industrial tapes are inapposite in the surgical field where sterilization is required. (A. J. Deer Co. v. U. S. Slicing Machine Co., 21 F.2d 812 (C.A.7, 1927)).

20. Plaintiff calls the Cress bandages a "notorious delaminator."

21. In the Stenvall case the Court answered the defendant's contention that the Gross substitution of facing material was not invention, thus at p. 134 of 193 F.Supp.: "The substitution of one material for another ordinarily does not amount to invention. Hotchkiss v. Greenwood, 1850 [11 How. 248], 52 U.S. 248, 13 L.Ed. 683; Dewey & Almy Chemical Co. v. Mimex Co. [2 Cir.], [124 F.2d 986] supra. However, substitutions have uniformly been held inventive in those cases in which the substitution solved a significant problem which prior efforts have failed to handle satisfactorily. Smith v. Goodyear Dental Vulcanite Co., 1876, 93 U.S. 486, 496, 23 L.Ed. 952; Perma-Fit Shoulder Pad Co. v. Best Made Shoulder Pad Corp., 2 Cir., 1955, 218 F.2d 747, 751.

"The fact that the new substituted material had properties well known to the trade or even to the general public, or the fact that the substitution does not involve discovery or utilization of an unknown or unexpected property of the material is of no significance. George Frost Co. v. Cohn, 2 Cir., 1902, 119 F. 505. * * *"

"The Gross invention was much more than a mere substitution of materials. It was the solution of a significant problem which prior efforts had failed to handle satisfactorily."

22. An April 30, 1952, notation of defendant's employee revealed the lap over portion of the release sheet heat sealed during sterilization process.

23. And Mylar's use as a parting sheet for low pressure laminating and packaging of articles to be sterilized, such as bandages; citing DuPont's Hofrichter Patent No. 2,650,213, filed July 24, 1951, the laminating adhesive being entirely a contribution made by Arvey Corporation.

24. Norman P. Hickok. Richardson testified there was nothing in the prior art

May, 1952 (DX 139, Item 31).[25] Also, defendant belittles the inventiveness of Gross, citing evidence that a mere bit of pressure on a crinoline faced bandage would achieve the smoother surface effected by the continuous film of Gross' patent.

As demonstrative of the inventiveness and value of the Gross revelation both in the Patent Office and the trial of this case, there was presented a "can" test by which a can was lifted by means of affixing a half of the adhesive bandage thereto.

Defendant belittles [26] the can lifting test as revealing the quick-stick quality of the Gross bandage as simply affecting "the initial grabbing qualities of an adhesive when pressure is not applied," the "can test" having no other utility and not being typical of normal bandage application to the skin.

Defendant intimates that plaintiff's dominant position in the industry (70-75%) and financial ability "to indulge in a million-dollar advertising campaign and promotion" utilizing the dramatic can demonstration was able to create a demand, in a field where the conventional crinoline-faced bandage was a "commer-cially successful adhesive bandage," and was able to stand the increased cost of the continuous facing. Defendant had "to await availability of commercial techniques for a sterilization method other than steam-sterilization" and it perfected commercial techniques for chemical sterilization in late 1953, adopting poly-ethylene facings. It points out that success of a product should be jealously scrutinized "if at about the same time others began the same experiments in the same or nearby fields, or if these come to fruition soon after the patentee's, * * * Such a race does not indicate invention." (Ruben Condenser Co. v. Aerovox Corporation, 77 F.2d 266, 268 (C.A. 2, 1935))

Defendant denies copying [27] plaintiff's patent disclosures, saying plaintiff saw defendant's Munising [28] 842–C1S coated vinyl facing adhesive bandage on March 12, 1953,[29] before plaintiff had filed any patent application directed to a continuous facing and before it had marketed its Super-Stick bandage.

Defendant insists that the patent cannot be limited to sterile adhesive bandages because that limitation was not stated in the original application [30] not ap-

---

about a smooth adhesive having more tack than a rough adhesive.

25. A reading of this article discloses, however, no possible relevancy, the only statement remotely pertinent being "The actual holding power of a tape depends upon the area of adhesive surface in contact with the material to be held" stated after a discussion of selecting the size of tape width for doing a proper job. Plaintiff differentiates the Article's use of the phrase, holding power, in meaning from tackiness and points out the Article does not reveal how to achieve greater tackiness.

26. "The can-lifting test is an arbitrary clever means, devised by plaintiff. * * * Two bandages which show vast differences in can-lifting ability can perform with equal adhesion to the skin, when, as is usually the case, the bandage is pressed onto the skin to secure intimate contact."

27. But even copying could not "lend validity to a patent * * *" (Goldman v. Bobins, 245 F.2d 840, 844 (C.A.7, 1957); Williams Mfg. Co. v. United Shoe Machinery Corp., 121 F.2d 273, 277 (C.A. 6, 1941), aff'd 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537.

28. Plaintiff states there is no evidence in the record to support defendant's statement that the Munising paper used by both in 1952 was made in accordance with the Donaldson patent.

29. Defendant states it had successfully tested and reduced to practice its steam-sterilizable Munising Vinyl coated paper facing for adhesive bandages in April, 1952, before plaintiff had made any Gross patent adhesive bandage utilizing either Mylar facing or cellulose triacetate facing. It cites the fact that the Gross patent did not issue until March, 1955, long after defendant sold both its vinyl coated and polyethylene film bandages.

30. Citing Universal Oil Products Co. v. Globe Oil & Refining Co., 137 F.2d 3, at p. 6 (C.A.7, 1943).

pearing until the application of January 4, 1955, and that sterility or nonsterility was of no significance on the critical issue of patentability in the Patent Office.

It cites its 1949, 281 Tape, a polyethylene film facing developed and patented by it (Patent No. 2,630,954) revealing knowledge in 1949 that polyethylene pressed against the adhesive made the double faced adhesive tape smoother on the side on which the polyethylene film was smoother than on the side on which it was rougher. Clarence T. Fishleigh called the Bauer & Black 281 Tape as the closest public use.

Plaintiff maintains the 281 tape, which defendant's witness considered a public use of polyethylene film as a facing, has no better standing than the Calvert Patent No. 2,541,498 which was held not to disclose the Gross invention in the Stenvall case, supra, and since the 281 tape was not the same product defendant started sale of in 1954, it is not a prior use.[31]

Further, defendant cites its use of Holland cloth·faced sterilized surgical adhesive tape in the period of 1938 to 1942, as to which the Kemp report of 1938 stated that:

"The Holland cloth increases the apparent tack and adhesion due to the fact that a flat surface of pressure-sensitive mass results, rather than the pebbly surface which resulted from the crinoline. * * *· It was also found that the Holland cloth had a protective action on the adhesive mass during sterilization, so that ordinary mass might be used rather than vulcanized mass, without deterioration. Oxygen bomb aging tests on such tapes indicated excellent aging qualities after sterilization. * * *"

Defendant claims that this tape included all four allegedly novel aspects of the Gross patent, and in addition was steam-sterilizable.[32] It points out there need be no proof of sale of the item under 35 U.S.C. § 102(b), but simply that it be on sale, and such proof was adduced in promotional literature to customers in 1938. Defendant states actual sale as early as 1938. It also points out the Holland cloth faced sterile adhesive product is described in the 1950 U. S. Pharmacopoeia.

Plaintiff, however, maintains not only is there not proof of a single sale but to qualify as being "on sale" defendant must meet the strict requirements of proof that the article is " 'on the shelf' available for distribution."[33] Gross said he never saw a sterilized adhesive bandage faced with Holland cloth on the market prior to 1945.[34] When he attempted to use Holland cloth he found it left a

31. Trabon Engineering Corporation v. Dirkes, et al., 136 F.2d 24, 28 (C.A.6, 1943). Plaintiff also points out that the defendant's sworn *admissions* in the Elson and Doyle application for a patent on the polyethylene faced adhesive bandage, the subject matter of which *had not been in public use* more than one year before the date of its application, May 19, 1954, as tantamount to the feeling that tape No. 281 was not an invalidating public use and sale.

32. Plaintiff belittles defendant's witness Ziegler's attempt twenty-two years later to prove the tape was wound under tension providing intimacy of contact and occlusion of air but having lapse of memory as to an event of a week preceding. Also it points out evidence that the facing was not the current type of higher gloss Holland cloth and left imprint of threads, the facing being no more than a very good crinoline, and with some of the adhesive transferring to the facing and some of the starch of the facing transferring to the adhesive tape; showing lack of inertness in the facing not due to the three and a half years' age. Plaintiff points out that its own use of Holland cloth was limited to non-sterilized applications (Heavy Back Plasters).

33. F. E. Myers & Brother Co. v. Goulds Pumps, Inc., 91 F.Supp. 475, 497 (D.C. 1950).

34. The date of Gross' concept is fixed between December, 1944, to July 1945, and organized research to implement it. These facts are amply demonstrated by oral and documentary evidence with reduction to practice of some claims on May 20, 1947, another, in September, 1949. The work was carried on *inter alia*, by Janssen in 1945, Aaron in 1946,

residual deposit of starch on the adhesive mass and would wrinkle during sterilization and there would be detackification of the mass. An imprint of the Holland cloth would be left on the adhesive.

Defendant points out that its Holland cloth [35] faced sterile adhesive tape examined at the trial was at least eighteen years old, and had more tack than it would have had had it been faced with crinoline; that the slight discoloration did not show lack of inertness as plaintiff claims, but was wholly visual. Defendant notes plaintiff still was itself using Holland cloth on its Heavy Back Plasters to the time of this suit, citing a Gross letter of March 28, 1949, praising Holland cloth as a backing.

Holland cloth was proved, defendant asserts, to be satisfactorily chemically sterilizable, and also readily lifted a 300 gm. can.

Defendant cites the sale of the Cress bandages in the United States prior to the release of plaintiff's continuous facing bandage and more than one year prior to June 25, 1953, which it says was "in all essential respects like the bandages of the Gross patent except for their inorganic metal instead of organic facing." They were sold in sterile form; the aluminum foil facings were removable, and while "conceding that the make-up of some of the Cress bandages, including the bond to the backing, may have been far from perfect, that does not establish any general lack of utility of the bandages. On the contrary, they were sold and resold to the same customers in substantial quantities." Defendant maintained that "[e]ven plaintiff's and defendant's bandages on occasion become gummy and delaminate." Also, lack of a "can" test of Cress bandages is immaterial because the claims of

the Gross patent do not require any particular degree of tack or adhesion. The mere substituting of an organic facing, defendant insists, cannot constitute invention.

Plaintiff's answer on the Cress defense is that while the evidence discloses that something known as a Cress bandage,[36] sterilized, was sold in the United States, it is not shown just what that Cress bandage was, and that it was a public use of the Gross invention. No actual Cress sterilized bandage manufactured in the pertinent period was produced, nor was it shown that what was sold was an embodiment of the Gross invention which embodiment is necessary to constitute a public use;[37] that while it was testified that hundreds of thousands of the Cress bandages were sold here, and therefore presumably hundreds of retailers, but two witnesses, George T. Fuzak and William F. Haak were called and their testimony was entirely inadequate, Fuzak not even knowing what metal the foil facing was made of, and did not understand and left unanswered the question asking characterization of contact of the facing and adhesive. The other witness, Haak, is charged with an "apparent grievance against the plaintiff" and as having, in a contemporary note of the critical period, stated he had not examined the Cress bandage.

Plaintiff further points out that defendant does not charge the Cress facing with being "releasable," simply with being removable. The Cress bandage, plaintiff states, was a commercial failure which had no "discernible impact on the art." While a metal faced bandage can be so constructed to embody the four principles of Gross (except not being organic), still with such metal facing it may be necessary to use a release coating

Lundh in 1946, Collins in 1947, Godwin in 1947, Blackford in 1948, and Sellers in 1951.

35. Cheaper Holland cloth transfers more readily to the adhesive mass than expensive Holland cloth.

36. Testimony revealed that some of adhesive adhered to facing and places on the adhesive bandage where there was no adhesive—that as much as 75% of the adhesive mass remained on the metal foil facing.

37. Goodwin v. Borg-Warner Corporation, 157 F.2d 267, 272 (C.A.6, 1946).

and control the amount and properties of the adhesive to achieve the desired result.

Defendant relies on its "Cederroth [38] or 'Swedish'" defenses of "prior knowledge," [39] which arise out of the fact that although "under our established patent laws evidence of public use and sale in Sweden is not a defense, the many prior printed publications * * *" [40] are such a defense, citing the advertising literature of 1949 and 1950, May of 1952 and May of 1953. An advertisement of June, 1952, describes Cederroth's substitution of plastic for cellophane. Mr. Stenvall is said to have visited the Cederroth establishment in Stockholm in the summer of 1951 and brought back several samples of the Cederroth adhesive bandages to the United States.[41]

Defendant cites the Morgan Patent No. 2,484,045,[42] application for which was filed October 6, 1947, and issued October 11, 1949, on "Surgical Dressing" as describing "Continuous Facing Adhesive Bandages," as was stated in the Gross patent.

Plaintiff claims defendant has adroitly manipulated the materials Morgan enumerates for backings into facings, whereas Morgan separately and specifically names his facings with no discrimination in the choice of materials listed including crinoline. It points out Morgan taught slight adherence of facing, not intimacy of contact. The Morgan patent was cited to the Gross application in the Patent Office and rejected.

The Court believes that even a casual reading of the Morgan patent would indicate that that patent was in nowise directed to Gross' concept of instantaneous adhesion by imparting a smooth surface

38. The Cederroth application was filed March 16, 1948, for a "Design of Adhesive Plaster provided with Pad" which stated its chief characteristic feature "is that while the plaster is being stored, the adhesive substance is covered by an impermeable material that is smooth at least on the side next to the adhesive substance, for example, a sheet made of metal, plastic, cellophane, cellulose or the like, or specially-treated paper or cloth, instead of the gauze that has hitherto been used. A result of this design is that the adhesive substance is given a smooth surface, which has a considerably larger immediate adhesive power than if the plaster were provided with the previously-used gauze." The Swedish Patent Office rejected the application because it did "not essentially differ from what was previously known. * * *" Plaintiff understandably argues that no weight should be accorded the Swedish Patent Office opinion absent a showing of weight to be accorded a foreign patent office holding especially in view of the fact plaintiff was barred from showing evidence that the Gross invention had been accepted in eleven foreign countries.

39. 35 U.S.C. § 102(a); Coffin v. Ogden, 18 Wall. 120, 21 L.Ed. 821 (1873); Universal Winding Co. v. Willimantic Linen Co., 82 F. 228 (D.C.1897); Picard v. United Aircraft Corporation, 128 F.2d 632, 634–635 (C.A.2, 1942); Stitt, Trustee, v. Eastern R. Co., 22 F. 649 (C.C. 1884).

40. Plaintiff points out the "many printed publications" are not really that but are the abandoned Cederroth application and its translation which is a private communication never published or made available to the public. The other articles relied on pertained to the unpublished, abandoned application, so must also fall. Nor can the Cederroth patent application be used to bolster contention of lack of invention derived from contemporaneous discoveries because indirect use of evidence cannot be made of evidence not usable directly. (Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 400, 46 S.Ct. 324, 70 L.Ed. 651).

41. Plaintiff belittles the weight of the evidence adduced on this phase as incredible, full of discrepancies and inconsistencies. Furthermore, "no matter how widely known foreign work becomes among persons living here it cannot defeat a United States patent unless 'patented or described in a printed publication.' City of Milwaukee v. Activated Sludge, Inc., 69 F.2d 577, 588–9 (C.A.7, 1934); Westinghouse Mach. Co. v. General Electric Co., 207 Fed. 75, 77–78 (C.A.2, 1913)."

42. Witness Henry M. Richardson pointed out the Morgan patent says nothing about organic or inorganic agent; nor does it say whether it is a smooth film or not, nor does it teach that by pressing facing in intimate contact air pockets are excluded.

to the adhesive by the facing film—rather the Morgan patent seems concerned solely with the eliminating of frayed ends of the gauze pad by the method of folding the gauze pad and placing it on the adhesive, on an extensible bandage.[43] Not even a studied and careful reading of the Morgan patent would teach a worker in the field any relationship of the value of intimate contact between a smooth facing and the adhesive mass, thereby imparting a smooth surface to the adhesive and resulting in instantaneous adhesion.

Morgan's facing is solely a *protective* layer not possessing a positive function of effectuating a change in the adhesive surface.

Plaintiff points out that defendant is in error in equating Morgan's teaching of slight adherence to the releasability found in the Parke-Davis bandage having a silicone facing because this facing with an organic release agent was a very late development, unknown in the art prior to 1957. Plaintiff further states there is no evidence that Parke-Davis shifted from aluminum foil to silicone facing for reasons of cost. Parke-Davis found "early delamination" of aluminum faced bandages.

The second patent named by defendant, Scholl, No. 2,209,210,[44] filed November 23, 1935, and issued July 23, 1940, covered a "Mounting *Card* For Medical Pads And The Like." (Ital. supplied.) This Scholl patent was not cited in the Patent Office, the patentee declares. The value of this invention is that theretofore the medical pad had been placed "upon a starched relatively coarse-woven crinoline or gauze backing * * * [which] not only effected some injury to the adhesive surface, but was unsightly and difficult to handle in that the adhesive would project through the interstices of the backing and adhere to whatever it came in contact with. * * *" Scholl further stated:

"An important feature of this invention is the provision of a paper or fiber card provided with a surface to which the adhesive surface of a pad may be attached, such card surface affording efficient reception for the adhesive to adhere thereto, and permitting the ready removal of the pad without injury. * * * For this purpose, regenerated cellulose is one substance that is satisfactory or suitable. * * * With the card having a surface as above described, any one of the pads may be removed from the card, leaving substantially no trace of its former presence. The adhesive surface * * * is not injured by its application to the card, nor is it subject to loss of its effectiveness by reason of its adherence to the card for even a considerable length of time, so that the pads may be easily removed from the card, and applied to the body of a user with excellent results. * * * [I]t will be understood that substantially any kind of medical pad may be attached to the card, or a small bandage having an adhesive surface and items of similar character.

"From the foregoing, it is apparent that I have provided a novel com-

---

43. Morgan's specifications state: "An object of the invention is the prevention of fraying in pads that include otherwise frayable layers. Other objects are the provision of an extensible bandage that can be extended without fraying; the provision of a pad presenting no exposed cut sections of the fabric, and the provision of a bandage in which the central absorbent pad does not lose its shape, does not inhibit extension of the carrier strip yet adheres securely to the carrier strip even during and after extension of the latter. It is yet another object of the invention to provide an adhesive bandage with a soft pad, the center portion of which is adapted to contact evenly most any surface to which the bandage is applied.

"The invention provides an adhesive bandage presenting no exposed margin which could become frayed."

44. Selected by Fishleigh as most pertinent disclosure of Gross patent.

bination of medical pads having an adhesive surface of the zinc oxide type attached directly to a mounting card, decorated or otherwise, and which combination may be carried loosely in a purse or the like with no external wrapping, and with no injury to the pads themselves or to other objects carried in the purse. The invention lends itself to economy in manufacture, to a more pleasing appearance and to greater facility in use. * * *"

It is obvious that Scholl was solely concerned with a means of preserving the bandage while it was being displayed or transported, and found that a regenerated cellulose facing made a surface from which the adhesive was readily removable without transfer of the adhesive to the card, or the card to the adhesive. As to Scholl, plaintiff points out and the testimony so indicates [45] that the surface of the adhesive mass is rough when removed from the supporting card.

Another patent cited by defendant, Donaldson, No. 2,450,083,[46] filed February 7, 1944, and issued September 28, 1948, for a "Treated Paper Liner for Adhesive Rolls" was for a facing [47] of synthetic resin bonding fibres of the sheet used to cover an adhesive mass on a sheet or roll of adhesive, to protect it from contamination and preserve it. It was easily and freely removable without either the adhesive or facing transferring to the other. The specifications speak of the synthetic resin putting a smooth surface on the facing but do not teach that it results in a smooth surface on the adhesive mass, nor the benefits inherent therefrom. They note benefit to the adhesive in the retention of the preservation of the mass.

Donaldson, too, plaintiff points out, kept his liner " 'physically separated' " from the adhesive mass with " 'just enough adhering power to stick to the tape' " indicating very slight or light application of the paper to the adhesive coating of a roll of tape which was not wound tightly. Donaldson aimed at preventing outside air from entering, not from preventing occluded air. His mention of cellulose acetate, plaintiff states, is meaningless because he classes it with several other unsuitable materials which "indicates that Donaldson did not understand the criticality of inertness" of this Gross patent.

The German Sander Patent No. 679,-267,[48] published August 1, 1939, was for a "Wundpflaster" (wound plaster), and recited the problem that existed of air entering when a gauze facing was used and caused the deterioration of the adhesive mass. It taught the impregnation or coating of the gauze with polyvinyl or polyacryl products which results in a "smoothing of the gauze" which thereupon no longer absorbs the adhesive mass tearing it from the backing upon removal of the facing.[49] There is no teaching whatsoever of the value of having a smooth facing to smooth the adhesive mass for instantaneous adhesion,

45. The Court's inspection of the felt corn pad also revealed the surface to be far from smooth as compared to the surface to which it was affixed. Gross pointed out that the regenerated cellulose of Scholl might or might not have withstood chemical sterilization, and Scholl was interested in only very slight adherence to the card.

46. There was testimony that there was no recognition in the Donaldson patent of the problem of inertness and criticality when dealing with a plastic or pressure-sensitive adhesive mass. Gross points out Donaldson does not teach the importance of intimacy of contact.

47. As to the facing the patent states: "As material for impregnating the paper all materials tested which are designated in the art as synthetic have proven suitable. Synthetic rubbers, especially those mixed with plasticizers, synthetic resins, plastics, lacquers, varnishes, cellulose compounds, e. g., ethyl cellulose or cellulose acetate, and others have given satisfactory results."

48. Cited by Fishleigh as best reference along with Morgan, on vinyl.

49. Gross' testimony pointed out that it might take several coats to close interstices of the fabric and would nevertheless still leave imprints on the adhesive mass.

nor intimacy of contact to prevent occlusion of air.

■ Plaintiff also points out that since Sander's facing and backing are the same material, if there is pressure in intimate contact of the facing, some of the adhesive would adhere to the facing and some to the backing. Since Sander is a foreign patent it can be relied on only for what it clearly discloses.[50]

The Calvert Patent No. 2,541,498, issued February 13, 1951, on application of January 29, 1948, was for a "Polyethylene As A Liner For Tacky Rubber" and was clearly only to provide a *protective* facing until the tacky surface, including adhesive tape, was to be used, and to prevent adhesion of the surfaces during storage. The facing was readily removable, leaving the surface clean and suitable—but there is no indication that the object of the invention or the recognized advantage of the invention was to leave the surface smooth for the purpose of instantaneous adhesion.

The Sampair Patent No. 2,350,369, issued June 6, 1944, on a "Tape Roll and Core" is directed to the manner of construction of the core on which the adhesive tape is wound to prevent telescoping of the tape during the winding process or when the temperature conditions induce telescoping. Defendant lifts from the Sampair specifications the statement: " * * * [I]t is desirable to wind the rolls of tape under greater tension than has heretofore been feasible, as for example to minimize the inclusion of air pockets and to cause the adhesive coating to contact completely the back surface of the adjacent film backing." But the reason for the desirability of the exclusion of air pockets is not disclosed.

The Huerre Patent No. 2,728,687, issued December 27, 1955, directed to a "Method of Improving Adhesive Characteristics of Adhesive Tape and Resultant Article," plaintiff deems unimportant because addressed to a tape and not an adhesive bandage, without reference to sterilization. Therefore plaintiff insists that the Huerre patent cannot be claimed as a reduction to practice prior to plaintiff's Claim 5, covering polyethylene, because the interference rule requires that the claim read precisely upon the disclosure of the rival inventor.[51] Seller's Progress Report of May 2, 1952, shows that he made satisfactory testing of several polyethylene facing materials upon an adhesive tape and reported excellent quick stick; this was prior to the constructive reduction to practice date of Huerre on September 25, 1953.

Defendant seeks to avoid the charge of infringement by claiming that its adhesive mass is "smooth with a glossy finish" *prior* to the application of its continuous facings, and becomes rougher and less tacky and is capable of picking up less weight *after* the application of the continuous facing, and after sterilization.[52]

Defendant stresses the provision of 35 U.S.C. § 103, which renders unpatentable an invention, which though not theretofore identically disclosed, the differences are such that the "subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." It main-

50. Carson v. American Smelting & Refining Co., 4 F.2d 463, 465 (C.A.9, 1925).

51. Parker v. Ballantine, 101 F.2d 220 (CCPA, 1939).

52. Defendant contends that plaintiff is now "reading out of the claim the limitation which it was forced to insert by amendment after rejection of application claim 7 and after the can test demonstration, and attempting to recapture the coverage that it would have had if claim 7 had been allowed," contrary to the rule of Schriber-Schroth Co. v. Cleveland Trust Co. et al., 311 U.S. 211, 220, 61 S.Ct. 235, 85 L.Ed. 132 (1940) ; Peters & Russell, Inc. v. Dorfman, 188 F.2d 711, 715 (C.A.7, 1951) ; Hobbs v. Wisconsin Power & Light Corporation, 250 F.2d 100, 110 (C.A.7, 1957), and may not now claim as within the scope of the patent a structure wherein the smoothness of the adhesive was not acquired during the process of manufacture, by the application of the facing.

tains that neither need the public use, prior art patent, or publication be identical to defeat the claim of patentability.[53] Defendant asserts the claims involve only the application to adhesive bandages of facings known and used on other pressure-sensitive adhesive products, and with no new result; that the adhesive bandage is only a specific example of the general art of adhesive products intended to stick to an exterior surface.[54]

There is no patentable inventiveness, defendant says, under the decision of Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438, which requires a "substantial discovery or invention" not a "trifling device," or "every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufacture."

Plaintiff maintains, however, that Gross' "inventive discovery * * * involved the intelligent comprehension of relations not before recognized, although actually existing, followed by the conception of how they can be practically utilized."[55]

Defendant asserts plaintiff attempts to sustain claims which would prevent defendant and plaintiff's other competitors from making continuous facing adhesive bandages such as described in older patents, and endeavors " 'to subtract from former resources freely available to skilled artisans.' "[56] The inclusion of the old element to achieve a theretofore unrealized result also would not be invention[57] nor would " 'perfection of workmanship.' "[58]

Also cited to defeat plaintiff's advance, as patentable, are facings of Holland cloth[59] and metallic-facing surgical products, commercially used in defendant's double seal sterilized adhesive tape and in the sterilized Cress bandages. The selecting, defendant says, of polyethylene or plastic films for their known properties of better inertness with respect to either a chemically-sterilizable or a steam-sterilizable bandage, where the "superiority or excellence is one of degree only and is due entirely to the properties and characteristics of the particular substituted materials" is not invention.[60]

Defendant maintains that it was known in the art[61] that a smooth adhesive surface has greater tack or instantaneous adhesion than rough adhesive

53. General Time Corp. v. Hansen Mfg. Co., 199 F.2d 259 (C.A.7, 1952); Senco Products, Inc. v. Fastener Corporation et al., 269 F.2d 33, 34 (C.A.7, 1959). It also cites Vischer Products Co. v. National Pressure Cooker Co., 178 F.2d 125, 127 (C.A.7, 1949), where it was said at p. 127: "A new use of an old thing lacks the very essence of an invention."

54. Continental Scale Corporation v. Harrison Wholesale Co., 132 F.2d 463 (C.A. 7, 1942); Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58 (1941); Harnischfeger Corporation v. Miller Electric Mfg. Co., 173 F.Supp. 45 (D.C., 1959).

55. United Verde Copper Co. v. Peirce-Smith Converter Co., 7 F.2d 13 (C.A.3, 1925).

56. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950).

57. McIlvaine Patent Corporation v. Walgreen Co. et al., 138 F.2d 177 (C.A.7, 1943).

58. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58 (1941).

59. Plaintiff states Holland cloth was not proving satisfactory for sterilized products as shown by fact defendant could not use Holland cloth even for products not requiring sterilization.

60. S. O. S. Company v. Triangle Manufacturing Company, 156 F.Supp. 665 (D.C.Ill., 1957), aff'd General Foods Corporation v. Triangle Manufacturing Company, 253 F.2d 227 (C.A.7, 1958).

61. Defendant notes the Busse Publication "Tackiness of GR-S and other Elastomers": "They (tables) suggest the difference in tack of the hot-and cold-milled samples is largely due to the physical state of the surface. The samples which were cold-milled for a short time had rough creped surfaces which prevented intimate contact over large areas, so gave low values for the tackiness. The hot-milled samples, and the samples cold-milled for 30 minutes had smooth surfaces which allowed good contact and

surfaces and that adhesive smoothness was imparted by contacting a smooth surface. Such was the surgical adhesive tape in roll form, which when the adhesive tape was wound upon itself, took on the form of the backing onto which it was wound and some of the backing had smooth plastic coating on the back side. This was observed and recorded by Ziegler in 1939, and advertised in 1949 in connection with its product Wet-Pruf.[62] Defendant also cites the Visoback Pamphlets of 1944 and 1945, wherein the Dobeckmun Company stated that the application of its "smooth film 'Free from pin holes' to a rubber product including 'rubber tape' permits 'a perfect bond eliminating the danger or possibility of trapped air' leaving the adhesive surface 'a tacky bright *smooth* surface when stripped for use * * * assuring more tack than previously ob-

tained,' and that 'The highest degree of tackiness is secured when * * * calendered' since 'the affinity * * * is so high, no air will be trapped in the calendering operation.' "[63] (Italic supplied.)

Plaintiff insists that the date of conception, early in 1945, is properly predicated on the complete mental evolvement of the idea, without the necessity for its physical implementation.[64] Nor was Gross deprived of the right to patentability of his invention because others were working at his instance to perfect the medium to effectuate it.[65]

In answer to defendant's contention that there was no reduction of the invention to practice from 1948 until September, 1952, plaintiff points out that the construction of the invention need not be perfect.[66] The reduction to practice

so gave very high tack values. The decrease in tack of Sample I on standing twenty-four hours may be due in part, at least, to the development of surface roughness on standing." Plaintiff charges defendant with attempting to mislead the Court by the omission between quoted statements of fourteen intervening pages, which reveal the authors' prime interest in the development of a suitable test of tackiness to replace the conventional hand test of the industry and in the section dealing with adhesive tapes there was no discussion of smooth tack giving greater tack, and the reference quoted was with respect to the effect of processing on natural crepe rubber. The matter there being discussed was of the tackiness in respect to resistance to separation between two sheets of rubber.

62. Plaintiff answers that in respect to the Wet-Pruf tape defendant is not claiming it as an anticipation or public use but to belittle the breadth of advance of the patentee. Plaintiff points out that the disclosure of Wet-Pruf was not sufficiently obvious to defendant itself for it to adopt it. Further, plaintiff points out the Ziegler-Forssell letters while noting a greater smoothness of surface did not reveal that better tack was due to smoothing of backing but rather in difference of adhesive masses.

63. Defendant admits the Dobeckmun material was not satisfactorily steam-sterilizable, that fact did not detract from the realization of a smooth adhesive hav-

ing higher tackiness. Visoback article was dealing with "gum rubber stock" not with the different category of a pressure-sensitive adhesive. Plaintiff also points out that when the Visoback article was printed and distributed the quoted portion was omitted showing Visoback did not know or remotely appreciate that a smooth continuous facing could be used to get a smooth adhesive of the highest tackiness.

64. Mergenthaler v. Scudder, 11 App.D.C. 264 (1897).

65. Minerals Separations, Ltd. et al. v. Hyde, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286 (1916); Technical Tape Corp. v. Minnesota Mining & Mfg. Co., D.C., 143 F.Supp. 429, aff'd 247 F.2d 343 (C.A.2, 1957). Plaintiff maintains that Robinson was such an employee, but even if he were not, if he were a co-inventor, Gross' patent would still be valid, in that non-joinder of a co-inventor would not invalidate the patent, (35 U.S.C. § 256); Bestwall Mfg. Co. v. United States Gypsum Co., 290 F. 798 (C.A.7, 1923)). Plaintiff maintains similarly as to J. C. Sellers and Benjamin B. Blackford, and the fact that a patent application was filed in their name was a solicitor's misapprehension that the invention lay in the character of the facing material.

66. Walker on Patents; Deller's Ed., Sec. 103; Downs v. Andrews, 58 App.D.C. 91, 25 F.2d 218 (1928); Daniels v. Permutit Co., 137 F.2d 823 (C.A.3, 1943); Wire

need not necessarily be a commercial use.[67] Plaintiff claims its reduction to practice date as to Claims 1, 2, 9, 11 and 12 on May 22, 1947, or in any event not later than January, 1948, which antedates defendant's earliest reduction date of its employee's, Bowen's[68] work in 1952. Plaintiff insists that its Claims 4 and 8 are specific claims under broad Claim 2, as are also Claims 3 and 5, and are not themselves generic claims as in a chemical patent. Plaintiff points out that Bowen noted on April 30, 1952, that the "lap over portion of the release sheet heat sealed during the sterilization process." The work proved as unsatisfactory as did Doyle's in 1949.

■ The Court is not impressed, irrespective of defendant's failure to give notice thereof, with the contention that the 1949 consumer test was a public use. As plaintiff states, it was a test by its advertising agency on 100 housewives, to determine the efficacy of the crinoline and paper-faced bandages. The test was done in the presence of interviewers and all bandages were used up in the course of the test, and so was a permissible test and not an invalidating public use within the meaning of the patent statute. (Elizabeth v. Pavement Co., 97 U.S. 126, 134–137, 24 L.Ed. 1000; International Silver Co. v. Pomerantz, 271 F.2d 69 (C.A. 2, 1959))

Plaintiff believes defendant misapprehends the nature of the Gross patent to be a chemical patent with a single species supporting a generic claim, rather than being directed to an article of manufacture, involving a purely physical phenomenon, as to which a single species of the claimed invention is sufficient to support the generic invention.

It berates defendant as reconstructing by items "dredged up from the dim past" through "the easy wisdom of hindsight"

the invention of Gross, which practice is condemned. (Badische Anilin & Soda Fabrik v. Kalle & Co., 104 F. 802, 808 (C.A. 2, 1900))

Plaintiff maintains that the "Kemp report" stating the Holland cloth used in the 1938 tape to be "'highly-calendered, smooth, glossy'" is without supporting proof. Further, Kemp did not contemplate the use of Holland cloth for adhesive bandages and was only interested in finding an interliner for the tape. Even if Kemp's report states that

"'The Holland cloth increases the apparent tack and adhesion due to the fact that a flat surface of pressure-sensitive mass results, rather than the pebbly surface which resulted from the crinoline, * * * '"

"so far as the industry was concerned it had no existence at the time of Gross' invention and therefore cannot anticipate Gross." (Gayler v. Wilder, 10 How. 477, 498, 51 U.S. 477, 498, 13 L.Ed. 504). Plaintiff asserts Kemp's above statement was "uninforming, and was soon forgotten." It points out that "Holland cloth has been available all these years, but the only Holland cloth faced bandages in this case are those specially prepared by defendant for the trial, * * * they were not steam-sterilized * * * and still they show signs of delamination." So, it argues, "an invention which it is free to use, the fact that it is not used strongly demonstrates its inadequacy." (Ideal Stopper Co. v. Crown Cork & Seal Co., 131 F. 244 (C.A. 4, 1904))

Plaintiff assails defendant's reliance upon Stenvall's importation of bandages in the summer of 1951, as being incapable of being a statutory bar, in that it was not a public use, under 35 U.S.C. § 102 (b), and if deemed knowledge by Stenvall under 35 U.S.C. § 102(a) has no effect because subsequent to Gross' established date of invention.

Tie Mach. Co. v. Pacific Box Corporation, 102 F.2d 543 (C.A.9, 1939).

67. Corona Cord Tire Company v. Dovan Chemical Corporation, 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610 (1928).

68. Whom plaintiff claims is given prime importance upon failure of defendant's witness, Doyle, to prove credible.

Plaintiff relies upon the statutory presumption of validity (35 U.S.C. § 282) [69] and contends that if the Gross idea was as obvious as defendant claims it was it would have been adopted long before the patent's issuance. It also relies upon the pronouncement of Anderson Company v. Sears, Roebuck & Co., 265 F.2d 755 (C.A. 7, 1959), emphasizing the strengthened presumption of validity where the same patents cited in the Patent Office are adduced at the trial. (G. Leblanc Corporation v. H. & A. Selmer, Inc., 310 F.2d 449 (C.A. 7, 1962)) It is also pointed out by plaintiff that the Elson and Doyle abandoned patent application [70] states [71] that "Attempts, however, to substitute the film protective materials in adhesive finger bandages have heretofore been unsatisfactory" either because they held so tenaciously they stripped the adhesive from the backing, or could not survive steam-sterilization satisfactorily. Plaintiff further relies upon the "fundamental law" that defendant has the burden of proof "to prove a prior public use." [72] It charges defendant with an *ex post facto* reconstruction of records in an effort to show that it always knew that better tack or instantaneous adhesion in an adhesive bandage could be obtained by the use of a smooth continuous facing, even though defendant continued for many years to impart a rough and reticulated surface to the adhesive mass of its bandages by its use of crinoline as a facing material."

In the Stenvall case, supra, the plaintiff elected to prove that Gross was entitled to a pre-filing date of invention, [73] and showed that on January 13, 1948, Gross requested plaintiff's manufacturing department to produce a small quantity of adhesive bandages, and in July, 1948, an additional quantity of adhesive bandages was produced. The bandages had smooth continuous cellulose acetate facing members, which were inert with respect to the adhesive mass with which in most instances they were in intimate contact, and there was good releasability and the adhesive quality had been remarkably enhanced. Gross was corroborated by Blackford and both of them were confirmed by a progress report of Gross dated August 31, 1948. The Court found the experimental bandages to possess the qualities stated in the report and the testimony, and there was no contrary testimony. It concluded that plaintiff had met its heavy burden and proved an invention date in 1948.

69. Which presumption plaintiff claims "may not be defeated by excursions into the boneyard of failures and abandoned experiments" Reynolds v. Whitin Mach. Works, 167 F.2d 78, 83–84 (C.A.4, 1948) nor by "reconstructions of prior art patents 'in the light of the invention in suit,' * * *" (Naylor v. Alsop Process Co., 8 Cir., 168 F. 911, 920).

70. Rejected by the Patent Office on Calvert and plaintiff's Norland British patent and others. Plaintiff argues that the Doyle rejection because of the several other patents shows it did not consider industrial tape *per se* analogous to an adhesive bandage. It is also noteworthy that in this application Doyle stated under oath that the subject-matter of that application had not been in prior public use more than one year before the date of the application. The proof of the alleged Doyle invention rested entirely on parol evidence, not even his work notebook revealing such experiments, nor was there any such record of defendant's Director of Research or Works Manager. Nor were actual adhesive bandages then made produced, although other adhesive items were introduced.

71. Under oath by defendant's experts prior to the Gross patent, which statement, plaintiff maintains makes the 281 tape non-invalidating.

72. The Barbed Wire Patent, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1892). This case held that the proof "shall be clear, satisfactory and beyond a reasonable doubt."

73. Entailing a burden quite as heavy as in criminal proceedings, (United Shoe Machinery Corp. v. Brooklyn Wood Heel Corp., 77 F.2d 263 (C.A.2, 1935); Bearings Co. of America v. D. P. Harris Hardware & Mfg. Co., 299 F. 782 (C.A. 2, 1924)).

That Court also concluded that the invention had not been abandoned [74] after 1948 "but was one of continuous activity, primarily centered around Gross' efforts to overcome certain technical objections of plaintiff's merchandising department."

In the Stenvall suit the finding of identity of product led to the conclusion of infringement upon the finding of validity. Judge Solomon there held that Gross' invention was entitled to an effective filing date of June 25, 1953, and that the disclaimer by the joint applicant Shelley, of any part in the invention was valid, and the invention was established to be that solely of Gross.[75]

Judge Solomon further held that plaintiff, as assignee of the Gross patent, was entitled to an effective filing date of June 25, 1953, and that the defense of prior public use was without merit. This prior public use was the Bauer & Black market survey of March, 1953, made less than one year prior to that date.

The Court further held that the Cederroth, abandoned Swedish patent application could not qualify as a publication issued more than one year prior to the application, to defeat the Gross application, because "Applications which do not eventuate in patents do not constitute prior publication and are not part of the prior art." [76]

The Court dealt summarily with six patents and the Cederroth circulars finding that "Not one of them shows any appreciation of the problem sought to be solved by Gross, nor do they point the way towards such solution." (193 F.Supp. 128, at p. 133.) He disposes of the Donaldson patent as aimed at preventing adherence of any particles of one material upon the other. In the cited German Sander patent, Judge Solomon noted the impregnation is done to preserve the adhesive. He stated, at p. 133: "Neither * * * [patent] necessarily requires that the facing have a smooth and continuous surface—the central ingredient of the Gross invention." [77] Further, in testing the Donaldson patent, Gross found the paper liner delaminated after sterilization.

Judge Solomon made further findings:

"None of the prior art references, considered either individually or collectively, disclosed the Gross invention. Smooth, continuous facings of plastic materials were known in the art, but their use was confined to the pursuit of other and different results, and there was a total unawareness that such a facing could be employed under the conditions outlined in Gross to achieve greater, quicker and more satisfactory adhe-

---

74. Court pointed out defense of abandonment was not pleaded or noticed before trial.

75. He cited In re Roberts, 49 App.D.C. 250, 263 F. 646, 647, supportive of the proposition that the earlier application date is allowable where through inadvertence a joint application is later amended to the name of one alone, where there was identity of subject matter. He pointed out that the Patent Office held that the affidavits were sufficient, and he, in order to reverse, would have to find that the ruling was arbitrary and capricious and that the strong presumption that the Patent Office does not violate its own rules had been overcome. (Scovill Mfg. Co. v. Radio Corporation of America, D.C., 9 F.Supp. 239.) And even though there were irregularities in the procedure in the issuance of the patent it could not be made the subject of collateral attack by a defendant in an

infringement suit. (Mahn v. Harwood, 112 U.S. 354, 5 S.Ct. 174, 6 S.Ct. 451, 28 L.Ed. 665 (1884)).

76. White Cap Co. v. Owens-Illinois Glass Co., 203 F.2d 694, (C.A.6, 1953).

77. Judge Solomon states, at p. 133: " * * * neither of these two prior art patents would have anticipated Gross because neither was intended nor designed to accomplish the function of Gross, Topliff v. Topliff, 1892, 145 U.S. 156, 161, 12 S.Ct. 825, 36 L.Ed. 658; neither would have suggested the patented idea to a person skilled in the art unless he were examining it for that purpose, Cold Metal Process Co. v. Carnegie-Illinois Steel Corp., 3 Cir., 1939, 108 F. 2d 322, 333, * * *; and neither contained within its four corners, adequate directions for practicing the Gross invention, Dewey & Almy Chemical Co. v. Mimex Co., 2 Cir., 1942, 124 F.2d 986, 989."

siveness. The differences between the Gross invention and the prior art were so significant that it cannot be said that the invention would have been obvious to a person having ordinary skill in the art. In fact, the great amount of research in which the industry had engaged for a number of years to obtain more satisfactory adhesiveness, the great impact the plaintiff's bandage had on the market, and its phenomenal commercial success amply justify the conclusion that the result achieved by Gross was both surprising and unexpected. Reiner v. I. Leon Co., 2 Cir., 1960, 285 F.2d 501."

■ It is the Court's judgment that while the several fragments of the Gross invention were available in the published patents and articles, they lay unassembled and uncorrelated to achieve the novel and useful result which followed their integrated usage by Gross. Were they as evident as defendant maintains, their practical utilization would not have been delayed until after the Gross patent issued. In each of the many cited alleged prior art usages, patents and publications, there was a failure to appreciate the remarkable adhesion properties of the mirror smooth surface of the adhesive, imparted or enhanced by the facing film, which was releasable and inert to the adhesive, and yet withal unharmed by the U. S. Pharmacopoeia required sterilization process. The established usage by both plaintiff and defendant of crinoline, with its resultant imprint on the adhesive mass, and the transfer of starch from the crinoline to the mass, thereby diminishing the adhesive power by both those factors, had seemed the only choice available when sterilization became necessary. Holland cloth (more expensive) was no better in that respect as a facing.

The evidence might indicate the defendant had a glimmer of an idea on how to solve the problem and was striving through research to achieve it but was without the complete success the Gross invention effected.

The defendant's efforts at research and the disadvantage of paper facing as compared to crinoline are disclosed in the letter of October 21, 1952, in respect to vinyl coated paper.[78] The virtues of crinoline are extolled therein. A report for the second period of 1953 states that on tests it was found "that vinyl coated paper could not be slit and wound satisfactorily with our present equipment. If in the future it is decided to use vinyl coated paper in place of crinoline it will be necessary to have it slit and wound elsewhere." The report also states: "Several visual defects were noted after our standard steam-sterilization. 1. Wrinkling of film on paper facing. 2. Bubbling of film on paper facing. 3. Noticeable shrinkage of film on facing due to residual stretch."

As late as October 2, 1953, Doyle of Bauer & Black Division of defendant in an inter-office memo wrote:

"As recently as six months ago, samples of a similar type (The type of cellulose acetate-paper laminates made in 1948 by Dobeckmun Com-

---

78. The report states: "We should expect at least a 20 percent drop in production, a noticeable increase in waste, more off-center pads, and additional other misregistration faults if we substitute the present style of paper for crinoline on our present Curad machines. * * * Although the paper gives a better product from the point of view of tack and adhesion, there are some appearance disadvantages due to the fact that the shrinkage of the film and the flowing of the mass during sterilization show up more readily with the use of paper than they do with crinoline. * * * Mass comes off on the vinyl paper to a degree which is not acceptable. Using the same roll of tape with crinoline facing, we made Curads which were passable though poor. Thus, the use of vinyl paper in production may push some low anchorage runs back over the borderline and offset in part the gains made in tack and adhesion. The crinoline facing protects the tape from being torn during removal of the paper wrapping. With paper facing it is easy to tear the tape if the wrapper is torn with misdirected vigor."

pany) were not satisfactory for facing CURADS due to the failure of the adhesive bond used in laminating the acetate to the paper following steam sterilization. * * * "

The Court has some difficulty in reconciling Doyle's testimony that he made a good many bandages in June of 1948 and that he sterilized a portion of them and found them to be excellent, with the continued, diligent research efforts of defendant to achieve a satisfactory substitute for crinoline and to perfect a successful film facing.

A report on a meeting of December 5, 1952, indicates that one of the defendant's major projects for 1953 was to "Increase Tack and Adhesion. * * * Get consistency in Production. * * * Our most serious problem seems to be the 10 to 30% of the production that has low tack and adhesion. * * * New Facing Material to replace Crinoline. * * * The new paper material can well be the most important improvement step on both the quality and appearance of the product."

The January 30, 1953, report re "Consumer Dressings" by A. J. Hawkes, in respect to Curad Plastic Bandages states as to the facing material: "Coated Paper vs. Crinoline. The advantages of coated paper were considered as follows: Much improved Tack and Adhesion—normal and cold weather; * * * Improved ageing—less oxidation of mass; Improved appearance of back film; Better feel; No ravel threads." The disadvantages stated were: "No tuckfold for opening without touching pad. Possibility of tearing bandage when opening. Difficulty in removing from wrapper due to mass deposits when film shrinks paper." And it was agreed that: "(1) The factory would aggressively work toward solving machine problems; (2) A survey among consumers is to be made to determine (a) Extent of opening problem, (b) Preference between crinoline and paper faced product generally. If the survey proved favorable on counts a & b, the change to paper would be considered of high urgency."

The report would indicate that defendant had several problems to solve before achieving a merchantable product.

In view of the discussion in the Stenvall case, supra, and the findings which Judge Solomon made, with which this Court is in complete accord, it is unnecessary for this Court to discuss at length the defendant's contentions. As indicated above, none of the patents named, either those cited to the Patent Office, or otherwise, revealed to one working in this field the benefits which the smooth organic facing imparted to the adhesive by being placed in intimate contact therewith. The great improvement in tack with a minimum of pressure on application of the bandage to the skin, and the ability of the film facing to endure sterilization without modification or deterioration were evidently long sought for. Extensive and continued research for a long period of time by both plaintiff and defendant had been fruitless to achieve these results. Had this been simply a matter of substitution of materials or use of equivalents some skilled research-er in the field would have suggested it. When the conception did occur and was finally successfully implemented and patented, defendant acknowledged its efficiency by adopting it, even at increased cost.

The Court is not convinced as to the verity of the Cress defense, or even the efficiency of the metal facing utilized by the Cress bandages.

This Court is of the opinion that plaintiff's filing date is not to be limited to the date of January 4, 1955, that of Gross' sole application, but it is properly predicated on the prior joint applications with Shelley, and it is entitled to assert those application dates so as to preclude the defense of prior public use. (The Patent Office and the Court in the Stenvall case, supra, have so held and those holdings were not passed upon on appeal.) Nor does the Court believe that the Gross application was an improper continuation-in-part of the earlier joint

**144**

Shelley and Gross applications.[79] There can be no question that the Patent Office was satisfied with the affidavit of Shelley disclaiming the joint inventorship of the matter covered by Gross in his sole application, which succeeded and was encompassed by the joint applications. An examination of those earlier joint applications reveals the elements of the inventive concept of Gross, with some similarity of examples noted in the specifications.

 As to infringement, plaintiff points out, only the product claims of the Gross patent are sued upon, and not the method claims, and in testing infringement it is to be determined "whether the accused device does the same work in substantially the same way and accomplishes the same result" (Hunt et al. v. Armour & Co., 185 F.2d 722, (C.A. 7, 1950), irrespective of whether achieved by the patented method (General Electric Co. v. Laco-Philips Co., 233 F. 96, 107 (C.A. 2, 1916)).

The Court's examination of defendant's bandages, and the testimony of Henry M. Richardson, leave no doubt in the Court's mind that there is a smooth glassy surface left on the pressure-sensitive adhesive mass imparted by the intimately contacting organic facing member, with no occluded air pockets. It was after the marketing of plaintiff's bandage of which defendant was aware that defendant pushed the conversion of its machines to the production of paper facing. The competition with this new Gross bandage was causing defendant "real trouble."

The Court has no doubt of the infringement of the Gross patent claims in suit by defendant's products.

The Court concludes that Claims 1, 2, 4, 5, 8, 9, 11 and 12 of Gross Patent No. 2,703,083 are valid and infringed, and the declaratory relief sought by defendant in its counterclaim should be denied and the said counterclaim should be dismissed. The proposed findings of fact and conclusions of law submitted by the plaintiff

are approved by the Court and the plaintiff is directed to prepare and submit within ten days, findings of fact and conclusions of law, and judgment order consistent therewith.

---

79. 35 U.S.C. § 116; Rules of Practice of the Patent Office, Rule 45(b).