**DART INDUSTRIES, INC., Plaintiff,**

v.

**E. I. DU PONT DE NEMOURS AND COMPANY, Defendant.**

**No. 69 C 676.**

United States District Court,
N. D. Illinois, E. D.

Oct. 4, 1972.

George B. Newitt and D. D. Allegretti and Molinare, Allegretti, Newitt & Witcoff, Chicago, Ill., Thomas F. Reddy, Jr., Berj A. Terzian and Jonathan A. Marshall, and Pennie, Edmonds, Morton, Taylor & Adams, New York City, for plaintiff.

Melville C. Williams, Chicago, Ill., Earl L. Handley, Wilmington, Del., Ellis A. Ballard and Charles M. Chadd, Chicago, Ill., for defendant; Pope, Ballard, Shepard & Fowle, Chicago, Ill., of counsel.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PERRY, District Judge.

### FINDINGS OF FACT

#### I. NATURE OF THE ACTION

1. This is an action for infringement of United States Patent No. 2,877,501 which was duly and legally issued on an invention made by Rexford Bradt.

2. Plaintiff, Dart Industries, Inc., a Delaware corporation and owner of the Bradt patent, was known as Rexall Drug and Chemical Company prior to its change of name on April 22, 1969. Dart's Fiberfil Division manufactures and sells, inter alia, glass-reinforced thermoplastic molding compounds which are covered by one or more of the claims of the Bradt patent.

3. Defendant, E. I. DuPont de Nemours and Company, a Delaware corporation, has for a number of years manu-

factured and distributed various glass-reinforced thermoplastic molding compounds. DuPont has a regular and established place of business in Chicago, Illinois and has sold such injection molding compounds in this judicial district as well as elsewhere within the United States.

4. The Complaint was filed on March 28, 1969 and plaintiff's motion for leave to file an Amended Complaint was granted on April 17, 1969. On April 29, 1969 defendant answered the Amended Complaint and counterclaimed for a declaratory judgment, alleging that all of the claims of the Bradt patent were "invalid, void, and unenforceable and not infringed." Defendant's motion for leave to file an Amended Answer was granted on April 1, 1971. On April 12, 1971, plaintiff filed a Reply to the amended counterclaim of Defendant's Amended Answer to Amended Complaint, denying all of the material allegations set forth therein.

5. Plaintiff charges defendant with direct infringement of claims 1, 8, and 9 of the Bradt patent which cover the molding compound *per se*. Defendant's declaratory judgment counterclaim has put into issue all of the remaining claims.

## II. THE BACKGROUND OF THE CONTROVERSY

6. The Bradt patent issued on March 17, 1959 but DuPont first acquired knowledge of the Bradt injection molding compound in December, 1954 (PX 215, Interrogatory 55), obtained a sample of such compound in about July, 1955 (PX 215, Interrogatory 58) and evaluated the Bradt patent twice during 1960 (PX 85, Interrogatory 111). Experimental quantities of DuPont's glass-reinforced Delrin were first produced in June, 1961 (CX 1, par. 6). This Delrin compound· which is still being sold by DuPont is one of the accused products in this action (PX 5, PX 215; Interrogatory 2(d)).

7. During 1962, DuPont supplied substantial quantities of nylon resin to Fiberfil, Inc., then owner of the Bradt patent, for use in the manufacture of the Bradt compound (CX 1, par. 9). From this vantage point, DuPont assessed Fiberfil's growing business in contemplation of the manufacture of its own glass-reinforced injection molding compounds (T 926–927; CX 1, par. 7).

8. In July, 1963, shortly after DuPont commenced commercial distribution of its glass-reinforced Delrin compound, Fiberfil analyzed such compound and determined that it was covered by the claims of the Bradt patent (T 928, 931–932; PX 59, PX 60). Fiberfil so advised DuPont and offered a license under the Bradt patent (T 932–934; PX 61).

9. DuPont immediately initiated tests of its own which confirmed that the glass fibers in its Delrin compound did in fact "have alignment to a high degree" as was claimed in the Bradt patent (PX 61, PX 64). DuPont then entered into license negotiations and, at the same time, undertook further evaluations of the Bradt patent and its file history during which it considered the phenomenon of flow orientation of rod-like particles dispersed in liquids as a possible basis for invalidating the patent claims (T 939; PX 2, PX 64, PX 66).

10. On November 4, 1963, DuPont advised Fiberfil that although its glass-reinforced Delrin was covered by the claims of the Bradt patent, infringement of such claims could be avoided by the use of different extrusion techniques in the manufacture of the compound (T 945–946; PX 58). At that time, DuPont also requested that Fiberfil propose terms for a license (PX 58).

11. After consideration of the Fiberfil proposal, DuPont requested certain modifications and declined to take a license under the process claims of the Bradt patent because it produced its Delrin compound by a different method (T 948–949, 954–957; PX 70). The DuPont Plastics Department then submitted to the Patent Board a resolution seeking approval of the proposed license agreement with Fiberfil. In all, fifteen

separate departments formally approved the resolution (PX 73).

12. The license was executed on April 6, 1964 (PX 75), and in April 1969, after the commencement of this action, DuPont voluntarily terminated the license. While the license was in effect, DuPont paid royalties to Fiberfil based upon the actual production of the glass-reinforced Delrin compound which is an accused product in the present litigation (T 975–978, 1365–1366; CX 1, par. 8).

III. THE BRADT PATENT

13. Product claims 1, 8 and 9 of the Bradt patent cover an injection molding granule containing about 15 to 60 percent by weight of glass filaments which extend generally parallel to each other along the longitudinal axis of the granule and which are coated with a thermoplastic molding composition. The glass orientation enables the provision of a molding compound which is readily feedable in any desired quantity into the hopper of a conventional molding machine and which is injection moldable into useful glass-reinforced articles having enhanced physical properties.

14. The Bradt patent complies with the provisions of 35 U.S.C. § 112 in setting forth the best mode of carrying out the claimed invention, both in the molding compound itself and in the process for making it.

15. Of the claims asserted in this action, claim 9 is the broadest in scope, principally because it does not require a sizing compound. Such sizing compound may be applied to the glass fibers before they are coated with a thermoplastic molding composition to enhance the bond between the thermoplastic resin and the filaments, thus serving further to increase the reinforcing effect of the glass in the final molded article. Claim 1 requires a "polymerized sizing compound" and claim 8 "a thermosetting plastic composition" as the sizing.

16. Patent claims are to be construed in the light of the specification and proceedings before the Patent Office should be considered in determining the scope of the claims. A patentee can choose his own terms and use them as he wishes so long as he remains consistent in their use and makes their meaning reasonably clear.

17. The distinguishing feature of the injection molding granule claimed in the Bradt patent is that it contains glass fibers which are oriented generally parallel to each other along a particular axis of the granule (T 630–631, 2223–2227; PX 2, p. 19, PX 40, PX 189). The expression "generally parallel", as used in the Bradt patent, denotes that the glass filaments are pointing in the same general direction; perfect parallelism in the geometric sense of the word is not required (T 648–650).

18. As originally filed, claim 1 recited that the glass filaments were "arranged generally alone one axis of the granule" (PX 2, p. 11, PX 42). From reading the patent specification, it is readily determined that such axis is the direction in which the impregnated glass roving strand was traveling before being cut up into granules (T 640). Just before the application was allowed, however, the patent examiner raised a formal objection to claim 1 because it failed to provide an adequate antecedent for the expression "axis of the granule" (PX 2, p. 122). In response to this formal objection, claim 1 was amended while still bringing out that the glass filaments extend generally parallel to each other longitudinally of the granule (PX 2, p. 122). Application claim 10 [patent claim 8] and application claim 11 [patent claim 9] were also subject to the same objection. Thus, in Claims 1, 8, and 9 of the Bradt patent, the term "longitudinally" specifies that the direction in which the filaments extend within the granule is the direction in which they had been aligned in the roving strand before it was chopped into granules (T 649–650).

19. The scope of a patent claim remains unaltered by an amendment which is made to correct a formal defect.

Such claim is construed just as it was prior to the amendment.

20. The term "elongated" was introduced into the claims together with the expressions "generally parallel" and "extending longitudinally" in order to overcome the formal objection concerning the lack of a proper antecedent (T 641–642; PX 2, pp. 121–122, PX 42). This term serves only as the antecedent for "longitudinally" to aid in describing the particular direction in which the glass fibers extend and bears no relation to the geometry of the granule (T 641–645). Accordingly, claims 1, 8, and 9 of the Bradt patent are not limited to cover only molding granules which are longer than their diameter.

21. At trial, molding granules containing glass fibers which extend substantially the entire length of the granule were defined as "long fiber" compounds. Conversely, granules containing glass fibers which do not extend the entire length of the granule were defined as "short fiber" compounds. All DuPont accused products are "short fiber" compounds.

22. Claims 1, 8 and 9 of the Bradt patent contain no limitation as to the length of the fibers in the molding granule or with respect to the method of making the granule. During the prosecution of the Bradt patent, the question of fiber length was never raised. That the preferred process disclosed in the Bradt patent will invariably produce a "long fiber" product is no basis for reading a fiber length limitation into the product claims.

23. A patent is not limited to the embodiment of the invention shown and described in the specification since the claims of the patent measure the invention. An inventor is required only to set forth the best mode contemplated by him for carrying out his invention. Having done so, he is deemed to claim every form in which his invention may be copied.

IV. STATE OF THE ART

24. The earliest corroborated date of conception of the invention claimed in the Bradt patent is about June 1950 at which time Bradt disclosed his concept to Mrs. Virginia Tegarden of the Armorite Corporation during his first interview for a job with that company (T 544–546, 1719–1721).

25. Prior to the conception of the invention, reinforcement of thermosetting plastic resins with glass fibers had been practiced commercially (T 333, 1118–1119). Such thermosetting resins, when heated, harden and cure to a finished state (T 322), whereas thermoplastic resins such as contemplated by the Bradt patent, do not harden until cool (T 323).

26. Useful articles of either thermosetting or thermoplastic resins were made by the compression molding technique in which a resin charge is placed in the cavity of a two-part mold which is then closed and heated (T 322–323; PX 45). Whereas the applied heat converts a thermosetting resin to its hardened state so that a molded article may be removed from the hot mold, thermoplastic resins require that the mold first be cooled to a point below the softening temperature of such material. This characteristic of thermoplastic resin required substantially longer molding cycles and discouraged the use of such material in the compression molding process (T 324).

27. Thermoplastic resins were much more readily suited for the injection molding process which utilizes a cold mold rather than the hot mold required in compression molding. In injection molding as it was practiced at the time of the conception of the subject matter of the Bradt patent, thermoplastic granules are fed in a metered quantity into the barrel of an injection molding machine. A ram then pushes the feed charge into a heated zone where it is melted and forced rapidly through a narrow orifice into channels which lead

to the cold mold cavity. The injection molding process thus was more advantageous than the compression molding process, particularly for thermoplastic materials and for high volume production (T 325; PX 45).

28. In about 1940, it was proposed that thermosetting resins be injection molded by a process known as "jet molding" (PX 236). This technique utilized an electrically heated nozzle which almost instantaneously raised the temperature of the thermosetting resin above the curing temperature. The nozzle was then cooled rapidly to avoid curing of the material remaining in it after the completion of each cycle. However, as late as 1966, jet molding was still in the experimental stage. This process has not been used for the past ten years and has never achieved any significant commercial success (T 3181, 3216–3217).

29. Glass reinforcement was first used in the 1940's exclusively with thermosetting resins of various types (T 333–335). Such materials required either compression molding or laborious hand lay-up techniques in which multiple layers of glass cloth or glass mat were individually fitted against a mold and impregnated with thermosetting resin (T 333–335, 1119). Compression molding of glass mat impregnated with thermosetting resin imposed definite limitations on the shape of articles which could be made (T 335, 1132).

30. Reinforcement of thermosetting resins was also carried out with the use of glass roving which is a continuous glass fiber typically composed of 60 strands each containing 204 glass monofilaments (T 338–339). Roving was used at that time primarily to produce fishing rods by a process in which a long roving strand was impregnated with a thermosetting resin and then heat-cured to form the final product (T 1121–1122).

31. In late 1949, attempts were made to impregnate non-woven glass mat with a thermoplastic resin, specifically polystyrene (PX 95, PX 194, PX 195).

This material was, at first, compression molded (T 1131–1132).

32. Thus, in the first attempts to mold glass-reinforced thermoplastic resins, the old, uneconomical compression molding technique was utilized rather than the injection molding method which had proved more successful with thermoplastic resins. And in 1950 when Bradt disclosed his concept of glass-reinforced injection molding granules to Mrs. Tegarden, no suggestion had been made of a glass-reinforced injection molding compound although all of the individual materials necessary to produce the compound claimed in the Bradt patent were well known in the art (T 322, 338, 1121–1122).

33. At about the time Bradt disclosed his concept, others began to consider the injection molding of glass-reinforced thermoplastics. However, such efforts were confined to the use of resin-in-impregnated glass mat as a reinforcing material rather than the glass roving contemplated by Bradt (DX 35). This material, known as "diced mat", was used unsuccessfully on many occasions and was immediately and permanently supplanted by the Bradt injection molding compound (T 467–468, 547–550, 1197–1199, Karels dep., pp. 10–11, 39–44, 50–56; Wehr dep., pp. 13–14; PX 57, pp. 1–3).

V. THE INVALIDITY DEFENSES

34. The granule claimed in the Bradt patent provided for the first time a practical glass-reinforced injection molding composition which could be readily fed into the hopper of the injection molding machine, thus overcoming the recognized feeding problems of diced mat (T 868–869, 871–874; PX 55). It provided an easier flowing mass than diced mat and permitted incorporation of a greater percentage of glass (T 1824–1831, 2236–2237; PX 167). It enabled the production of molded articles having far greater strength than similar articles made from unreinforced thermoplastic material and also having significant increased strength over products

molded of diced mat (T 450–452, 883–887; PX 31, PX 32). The Bradt granule permitted the injection molding of glass-reinforced products of larger dimensions, provided greater uniformity of dispersion of glass in the finished product, and enabled more efficient operation of the injection molding machine (T 867, 878–882, 1197–1200; PX 57). Such beneficial functions can only be attributed to the generally parallel orientation of the glass fibers within the granule.

35. The Patent Office allowed the claims of the Bradt patent after considering fourteen references which were fully representative of the prior art (DX 216). Such references disclose the injection molding of both thermosetting and thermoplastic resins, various forms of impregnating glass mat and glass fibers, compression molding such material, and the use of sizing. Moreover, the Patent Office fully considered the injection molding of diced mat which had been in public use more than one year before the filing of the Bradt application (PX 2, pp. 99–100).

36. The claims of the Bradt patent were allowed by the Patent Office on the basis that the claimed invention was patentably distinct from the random glass fiber mat of the Simison Patent No. 2,639,759 and from diced mat because the glass fibers were oriented generally parallel to each other and extended along the axis of the granule (PX 2, pp. 99–100, 104–108, 112–117). These arguments and the facts supporting them were persuasive to the Patent Office on the question of patentability and DuPont bears a heavy burden in seeking to have this Court reach an opposite conclusion on the same question.

37. Having had disappointing experiences with diced mat, workers skilled in the art were wary of using Bradt's injection molding compound. The drawbacks of diced mat which had engendered this negative attitude included: poor feedability into the hopper of a conventional injection molding machine; inability to utilize the full capacity of the machine; disruption of the equilibrium of the machine which made it difficult to obtain continuous, dependable production; erosion of mold and other injection machine components; and, poor distribution of glass fibers in the final molded product (T 366, 447–448, 550–551, 1197–1199, 1218–1221, 1816–1822, 1827, 2777–2778, 4372–4373; Karels dep., pp. 10–11, 39–44, 50–56; Wehr dep., pp. 13–14; McVickar dep., p. 23; PX 55, PX 56, PX 57, PX 115, PX 167; DX 8).

38. The Bradt injection molding compound overcame all of the above-listed drawbacks of diced mat and became the first practical, glass-reinforced injection molding compound.

39. Bradt's solution of using generally parallel glass fibers in an injection molding compound did not occur to others skilled in the art who were confronted with the problems of diced mat.

40. Ernest of Victory Plastics encountered the diced mat feeding problem in January 1951 (T 2467–2468, 2662–2663; PX 224, pp. 109, 113–114; DX 6, DX 7). He attempted or considered six different ways to overcome the problem, each of which entailed modifying the diced mat as by extrusion, calendaring and regrinding (PX 224, p. 115). None of his attempts even remotely resembled Bradt's concept and all were unsuccessful.

41. Lindau, DuPont's expert, testified at trial that it never would have occurred to him to solve the diced mat feeding problem in the manner taught by the Bradt patent (T 4184–4186).

42. The Bradt injection molding granule and diced mat comprise the same basic ingredients but the novel structural arrangement of the glass fibers within the thermoplastic composition which was conceived by Bradt escaped others skilled in the art who were attempting to overcome the disadvantages of diced mat.

43. The Bradt invention as recited in claims 1, 8, and 9 of the patent in suit did not just provide an improved result

as compared to diced mat, it meant the difference between success and failure.

44. DuPont's effort at trial to establish the unpatentability of the Bradt invention over the prior art included an exhaustive consideration of its own British Patent Specification No. 618,094 (hereafter referred to as the DuPont British patent (PX 94)). Extensive testimony as to the disclosure and teachings of this patent was adduced by DuPont principally through the patentee, Maier, and its expert, Lindau. DuPont also performed two separate experiments in an attempt to reproduce the molding powder described in Example III of the DuPont British patent and demonstrated in court a plastic extruder in order to establish that Example III would inherently produce a molding granule containing glass fibers aligned generally parallel to each other and to the longitudinal axis of the granule.

45. The DuPont British patent is a foreign patent which must be strictly construed and restricted to what is clearly and definitely disclosed therein, without alteration. Moreover, it is a "paper" patent which has never contributed anything to the practical art and which has little, if any, weight on the question of patentable invention.

46. Whereas the distinguishing feature of the Bradt patent is an injection molding granule containing glass fibers which are oriented generally parallel to each other along the longitudinal axis of the granule (T 630–631), Maier testified that the essential aspect of the subject matter disclosed in his British patent was the use of short glass fibers having a length to diameter ratio of less than 40 to 1 which may be dispersed in a plastic composition without the tendency of one fiber to clot and agglomerate with its adjacent fibers (T 3801–3804).

47. Maier also testified that this patent did not on its face disclose Bradt's basic concept, parallel orientation of glass fibers (T 3804). Maier had never made any measurements or analyses to determine whether or not he had obtained a particular orientation of the glass fibers in his compound and he had no interest in this matter (T 3936).

48. Although Maier was well aware of the "flow orientation" phenomenon which DuPont has asserted would cause rod-like particles to align themselves generally parallel to the direction of flow during the extrusion through a die, he did not disclose it in his patent because it was not pertinent to his invention (T 3787–3788).

49. DuPont's flow orientation inherency theory depends primarily upon whether or not Example III of the DuPont British patent clearly and definitely discloses a process which utilizes an extruder of some sort because it is only by extrusion through a die that the rod-like glass fibers could possibly become flow-oriented in a direction generally parallel to the flow of the extrudate. However, DuPont witnesses who were skilled in the extrusion art, either believed that the "screw stuffer" which is described in Example III of the DuPont British patent was a device used to increase the bulk density of the material to make it more readily feedable into an extruder or were unable to determine what such "screw stuffer" was (T 2408–2409, 3593).

50. Example III of the DuPont British patent calls for a "screw stuffer" to produce the desired molding powder whereas Examples I and II provide for the use of an "extrusion machine" (PX 94, p. 2, lines 84–85, and p. 3, lines 3–5, and 20–22). Such distinction between a "screw stuffer" and an "extrusion machine" further supports the conclusion that "screw stuffer" is not an extruder.

51. DuPont has asserted that the "moulding powder" of Example III is equivalent to the "molding granules" which are described in the Bradt patent as being of cylindrical or rectangular in cross-section and having a diameter of about $\frac{1}{16}$ to $\frac{1}{8}$ inch (PX 1, col. 2, lines 45–47; PX 94, p. 3, lines 24–25). This contention necessarily assumes that such "moulding powder" is formed by extru-

sion through a die although neither an extruder nor a die are disclosed in Example III of the DuPont British patent. Moreover, the DuPont British patent does not specify the dimensions of the "moulding powder" and uses the same term in Example IV to denote a composition which is produced by milling on heated rolls (PX 94, p. 3, line 61). Such milling would produce a flat sheet rather than a cylindrical or rectangular granule and was, according to Maier, the common way to produce molding powders at the time he did his work (T 3745).

52. Even assuming that the DuPont British patent does in fact disclose an extrusion process, the disclosure offers no more than a starting point for further experiments and, if its teaching will sometimes succeed and sometimes fail and not inform the art how to obtain an injection molding granule having generally parallel glass fibers, it has not enriched the store of common knowledge.

53. DuPont's expert witness, Lindau, testified under direct examination that in reproducing Example III of the British patent, consideration would have had to be given to the design of the die in order to assure that the fibers would become aligned during extrusion (T 4016). He also testified that he would have had to examine the granules produced by the Example III process in order to determine the orientation of the glass fibers (T 4119). This testimony negates DuPont's contention that generally parallel flow orientation of glass fibers is the inherent result of the Example III process.

54. For the purposes of the action, DuPont produced molding compounds in accordance with what it contended were the teachings of Example III of the DuPont British patent. Two such experiments were conducted, and on each occasion its own witnesses testified that certain of such products exhibited random orientation of the contained glass fibers (T 3398, 3897–3898, 3924–3925).

55. DuPont also conducted two in-court demonstrations of a clear plastic model which was represented to be an "extruder" (T 3968–3969; DX 170). However, such device would not operate when loaded with a composition representative of those actually used to make glass-reinforced injection molding compounds (T. 3995–3998), and DuPont's expert, Lindau, testified that the device was not intended to demonstrate anything relating to the production of glass-reinforced thermoplastic injection molding compounds (T. 3989–3990). Accordingly, this demonstration was completely irrelevant to any issue which has been raised in this action.

56. Dart's expert, Dr. Colburn, testified that the nature of the orientation of glass fibers which were extruded through an orifice depended upon the presence or absence of a number of factors and that a generally parallel flow orientation of the fibers would not necessarily result. The testimony of a number of DuPont's witnesses supported this position (2409–2413, 2415–2416, 2419–2421, 2424–2425, 2428–2429, 2839–2841, 3040–3043, 3050–3052, 3430, 3432, 3438–3439, 3589–3590, 3636, 3750, 3776–3800, 3952–3962, 3966, 4400–4402, 4404, 4407–4413, 4415–4417, 4419, 4421–4429, 4434–4435; PX 272, PX 284, PX 286; DX 171).

57. The DuPont British patent contains no teaching in regard to any of the factors which may affect the orientation of glass fibers in an extruded thermoplastic (T 4432–4433). The interaction of such factors and the emphasis placed on one or the other will produce varying degrees of parallel or random orientation (T 4436–4437).

58. This conclusion is fully supported by DuPont's own admissions. In answer to an interrogatory which inquired as to the orientation of glass fibers in the injection molding granules made by Maier which are the subject of the DuPont British patent, the following was stated:

"The glass fibers or filaments are in a flow orientation pattern which varies from granule to granule. Flow orientation, a phenomenon well known

for many years, causes rod-like particles in a liquid flowing through an area of high shear such as over a sharp edge, or through a pipe or die aperture to tend to be oriented so that they point in the general direction of flow. The orientation is greater in the area of greatest shear, i. e., in the present case near the interface of the liquid and the internal surface of the die aperture. The final pattern of glass particles in the injection molding granules inquired about will vary within each granule, i. e., there is an orientation gradient, the glass at the cylindrical surface will be more oriented than the glass in the interior of the granule. The glass in the interior of the granule may be substantially unoriented. The orientation pattern for any particular granule will be affected by many other factors including (1) the amount of glass in that particular granule, (2) the location of the die aperture through which the granule passed as it was extruded in the flow pattern of the extruder, and (3) the cutting procedure employed." (PX 215, Interrogatory No. 44).

59. The photomicrographs which DuPont took of the granules made during its attempts to duplicate Example III of the British patent likewise support the conclusion that a generally parallel fiber orientation is not inherent in the Example III process of the DuPont British patent. A large photomicrograph made during DuPont's first experiment illustrates some degree of parallelism along the longitudinal edges but randomness in the central portions of the granule (T 3823–3824, 3927, 4447; DX 188). The photomicrographs from DuPont's second experiment evidenced the same phenomenon although to a lesser degree (T 4447–4448, 4451–4452; DX 209).

60. The only proofs adduced by DuPont which support its contention that generally parallel flow orientation is inherent in Example III of the DuPont British patent consist entirely of uncorroborated testimonial assertions. All of the objective evidence presented by DuPont, in the estimation of its own witnesses, contradicts its position. Dart's proofs, on the other hand, are completely consistent with DuPont's experimental results and admissions. Both serve to confirm beyond dispute that generally parallel flow orientation is but a matter of chance and certainly not inherent even in DuPont's version of the Example III process.

61. By their own admission, both Maier and his co-worker, Gore, were in pursuit of other results and were indifferent to the particular fiber orientation in whatever molding powder they may have produced prior to Bradt's conception in 1950 (T 3027–3029, 3936). If in fact either of them did make some molding granules by extrusion, and the contemporaneous documentation completely failed to support such assertion, parallelism of glass fibers would have been accidentally and unwittingly achieved. Nor would such parallelism have been the inevitable result of their process, but purely a matter of chance. Neither Maier nor Gore nor the British patent gave to the public the benefit of the concept of generally parallel glass fibers in a thermoplastic injection molding compound. The technological contribution was made by Bradt. Accordingly, neither the British patent nor the work at DuPont prior to 1950 is an anticipation of the concept claimed in the Bradt patent.

62. DuPont has pleaded seventeen patents and publications which were not considered by the Patent Office during the prosecution of the Bradt application; no such reference is more pertinent than the art considered by the Patent Office (PX 234, PX 235; DX 52, DX 54, DX 69–DX 73, DX 144, DX 172–DX 177). Four references which concern the flow orientation phenomenon are totally irrelevant to the problems which confronted workers in the art who attempted to injection mold diced mat in 1950 and 1951 (DX 69–DX 72). Unless one facing those problems had first conceived, as Bradt did, that parallel orient-

ed glass fibers in injection molding granules would provide a solution, the flow orientation disclosures would have no force or effect in suggesting anything of assistance. In the absence of the hindsight gained from Bradt's disclosure, these references would stand for naught and would not suggest any solution to the diced mat problem.

63. The Dent patent No. 2,309,342, pleaded by DuPont, teaches the manufacture of thermosetting resin pellets containing fillers such as wood flour, asbestos and cotton cord, floc or threads. Glass fibers are not disclosed. This patent states a "belief" that during the manufacture of the pellets, the fibers become flow oriented substantially parallel to the direction of flow. However, since injection molding of thermosetting resins was not first proposed until about 1940, this patent which was filed in 1939 obviously is addressing itself to compression molding of phenolic-type thermosetting resins (PX 236; DX 73). This conclusion is supported by the testimony of DuPont's injection molding expert, Houston, who stated that the Dent patent would not suggest injection molding to him (T 3185–3186). Moreover, Houston was not certain whether the Dent compositions could even be injection molded by the jet molding process because of their high filler content (T 3183–3185).

64. The additional art pleaded by DuPont adds nothing of significance to the art which was considered by the Patent Office during the prosecution of the Bradt patent. Nothing in these additional references would have suggested to a skilled worker in 1950 the solution which Bradt conceived to enable the practical injection molding of glass-reinforced articles. This conclusion is supported by the testimony of DuPont's expert, Lindau, who testified that none of the patents pleaded by DuPont were close to the invention claimed in the Bradt patent (T 4179–4180).

65. At the time Bradt made his invention, the art of injection molding had existed for at least twelve years (DX 216). In addition, a number of large chemical companies were then supplying substantial quantities of conventional unreinforced molding compounds. Research departments of several of such companies, including Owens-Corning Fiberglas Corp., Monsanto, DuPont, General Electric and Westinghouse, were actively engaged in experimental and developmental programs to produce an injection molding granule which would provide molded articles having the superior physical properties theretofore obtainable only by the relatively slow, cumbersome uneconomic compression molding and lay-up molding techniques (T 2354–2357; Wehr dep.; Brown dep.; McVickar dep.; PX 106, PX 113, PX 119; DX 112).

66. Since fiber-reinforced materials had increased the strength of thermosetting resin compression molded products, various such materials were considered. Although glass was recognized to be the best material for obtaining improved physical properties, it was also the least desirable because of its expected harmful effect on molding machines (Karels dep., pp. 10–11, 39–40, 50–56; Wehr dep., pp. 13–14).

67. The best solution the combined efforts of those skilled in the art could come up with was diced mat. However, this compound proved to be impractical for many reasons referred to previously. Because of such defects, diced mat did not prove a satisfactory solution to the problem which confronted the art (T 447–448, 550–551, 1218–1221, 1816–1822, 4372–4373; PX 40, PX 55, PX 56, PX 115, PX 167; DX 8).

68. In 1948, the Victory Plastics Company began actively to develop for the military a material which would be suitable for use in non-metallic land mines. A critical requirement for such material was high impact strength (T 2456–2458, 2463–2464, 2649–2650, 2654–2657). Victory carried out an extensive literature search for possibly suitable materials (T 2654–2655, 2706–2707), contacted material manufacturers, including DuPont and Owens Corning Fi-

berglas, and requested assistance from consultants in the field. However, aside from the Dow Chemical Company which in December 1950 suggested the use of diced mat, Victory received no suggestion to injection mold glass-reinforced thermoplastics (T 372–382, 2467–2468, 2654–2655, 2706–2709; PX 27, PX 28; DX 6).

69. The art's own assessment of its level of skill as late as August 1951 was that injection molding of glass-reinforced thermoplastics was still in the experimental phase and that diced mat, the only compound then generally known, was a make-shift material which had to be tolerated until a more practical compound could be developed (T 1214–1222; PX 55, PX 115, PX 116).

70. At the time Bradt conceived his invention, injection molding was known, fiberglass in various forms, including roving, as well as moldable thermoplastic resins were available, the problem was apparent to those skilled in the chemical, glass and molding art, and there had existed a need for a solution for several years. However, it remained for Bradt to conceive a thermoplastic molding compound containing generally parallel glass fibers in order to overcome the problems which confronted the art. The concept which Bradt provided still represents, after some twenty years, the best practical solution to the problem of injection molding glass-reinforced thermoplastics.

71. The generally parallel orientation of glass filaments constitutes the significant difference between claims 1, 8 and 9 of the Bradt patent and the prior art. This feature enabled the provision of injection molding granules which completely obviated all of the difficulties that had been encountered in attempting to injection mold diced mat, the prior art considered most pertinent both by the Patent Office and by DuPont. It enabled the first practical glass-reinforced injection molding compound for which the art had been searching and provided injection molded articles which

had enhanced physical properties to a degree which was surprising and unexpected to persons skilled in the art (T 398–399, 478–480, 924–925; Wehr dep., p. 38; PX 57, pp. 1–3).

72. The trial record contains clear evidence of the substantial commercial success which has been enjoyed by the Bradt injection molding compounds (T 153–155, 157–166, 169–180, 208, 461–464, 480, 1371–1372, 1374–1375, 1377–1381, 1422; Karels dep., pp. 10–11; CX 1, pars. 6, 10; PX 13A–PX 17E, PX 57, PX 75, PX 134, PX 136, PX 140, PX 142, PX 145, PX 147).

73. The injection molding granule claimed in the Bradt patent has been responsible for the establishment of a new field of commerce which had not previously existed.

74. Plastics engineers and injection molders expressed skepticism and doubt as to the operability of a glass-reinforced injection molding compound and, based upon previous adverse experiences with diced mat, did not believe that the Bradt compound would provide a solution to the problems which had confronted the art (T 1707–1715, 1766–1768; Brown dep., pp. 83–85; Karels, dep., pp. 9–11, 39–44, 50–56; PX 152, PX 158, PX 159).

75. Other workers in the art, including Victory Plastics (T 2484–2485, 2521–2522, 2672, 2743–2747, 2859–2860, 2872–2874; PX 31, PX 165, PX 169, PX 181, PX 224), Monsanto (T 513–514, 556–559, 1179–1180, 1282–1283, 1748–1749, 1797, 1802–1809; PX 103, PX 105, PX 165; DX 14, DX 37, DX 41), Owens-Corning Fiberglas Corporation and Dow Chemical Company (T 513–514, 556–559, 1797, 2380; Wehr dep., pp. 17–18; Brown dep., pp. 13, 20–23, 27–28, 33, 34–36, 78–81; Dow CTS Progress Report, January-February 1951, p. 5), and Lewis DeJonge Company (T 1243–1245; McVickar dep., pp. 30–33, 74–75, 87–90, 123–124; PX 298, pp. 37–38; DX 11), attempted to copy Bradt's concept upon learning of it.

## VI. THE PRIOR USE AND SALE DEFENSES

76. Victory Plastics' military contract relating to non-metallic land mines required the development of suitable designs and materials which at that time were not in existence (T 2456–2458, 2649–2650). Although such developmental work commenced in mid-1948, the first production mines were not delivered until 1955 (T 1902; PX 3, pp. 75–77). It is clear that the land mine project was still in its preliminary research and development stage when Bradt suggested to Victory in February 1951 that they test his new injection molding compound.

77. During the 1951–1952 period, Bradt had no injection molding machine available to him with which he could test his glass-reinforced thermoplastic compound. Accordingly, he required assistance from others who had such equipment (T 541, 1797–1798).

78. The evidence adduced at trial demonstrates that it was considered necessary by Bradt and other persons skilled in the art including Robert Maier, the patentee of the DuPont British patent, that a glass-reinforced injection molding compound be tested in an actual injection molding machine before a conclusion could be reached regarding its operability or feasibility (T 541, 1840–1841, 2131, 2780, 3777). Testing was thus necessary before Bradt's invention could be completed.

79. Victory's intended use of Bradt's granules was in connection with its developmental program (PX 103, p. 1) and Bradt's contemporaneous acknowledgements of Victory's initial order unequivocally state that it was a trial or experimental order (PX 165, PX 169). Even after Victory had first tested Bradt's molding compound in January 1952, its investigation and experimentation to find a suitable material for the land mines continued (PX 31, PX 33; DX 5).

80. At the time he persuaded Victory Plastics to accept a trial order of his injection molding compound, Bradt had neither the production equipment nor the glass roving required to make the 500 pounds of the product which he had promised to supply (T 1797–1798, 1836, 1838, 1840). Considering the nature of the Victory Plastics land mine project, 500 pounds was clearly an experimental or laboratory quantity (Mooney dep., p. 57).

81. Because of the Korean War, glass roving was almost impossible to obtain and Bradt required the Defense Order priority available to Victory Plastics to assist him in this regard (T 1841–1844). The scrap balls and short pieces of roving which Bradt had on hand when he agreed to provide Victory Plastics with the trial order were insufficient to produce the required quantity (T 2276–2278).

82. Bradt received his first 35 pound ball of roving from Owens-Corning Fiberglas on April 19, 1951. Such material could have produced only 100 pounds of his injection molding compound if there were no waste (T 2166–2167, 2177; DX 91). As of April 19, 1951, this was the only roving Bradt had except for possible scrap pieces (T 2281).

83. Bradt ordered four balls of roving for the Victory Plastics' order on March 16, 1951 (T 2295; PX 157K). This order was not delivered until about June 1951 and was not confirmed by Bradt to Victory Plastics until August 31, 1951 (T 1846–1848; PX 171).

84. During this period, Bradt experienced great difficulty in obtaining glass roving from Owens-Corning Fiberglas and his efforts to obtain this material were unsuccessful. T 1845–1846; PX 157A–PX 157HHH). Excluding the four balls of roving which he used for the granules supplied to Victory, between February 1951 and October 1951 when he delivered the injection molding compound to Victory, Bradt had only two experimental balls of roving (T 2302). Accordingly, aside from the Victory granules, Bradt was capable of pro-

ducing at most another 200 pounds of this material, assuming no waste.

85. In 1951, Bradt terminated his association with the Armorite Corporation and organized his own company in a new location. He operated a webbing and tape treating business he inherited from Armorite which provided his only source of income (T 1889–1894; PX 187). At no time during 1951 was Bradt in the business of manufacturing molding compounds or any related products (T 1889–1894; PX 187).

86. Because Bradt did in fact have only a very limited capacity to produce the injection molding compound which is claimed in his patent, the several representations that he made as to his ability to produce and supply substantial quantities of this material were nothing more than puffing and overstatements (T 2313–2316). Bradt also sought by this course of conduct to counteract the negative reactions of molders which had been engendered by the previous unhappy experiences with diced mat (T 1214–1223; PX 55, PX 115, PX 116). Bradt himself had also experienced such difficulties and was well aware of the problems (T 2284–2293; PX 199–PX 204).

87. In furtherance of his efforts to establish the utility of his injection molding compounds by an actual test in an injection molding machine, Bradt agreed to supply 200 pounds of this material for evaluation by the Dow Chemical Company in August-September 1951. This shipment was not delivered until February 5, 1952 (T 2217, 2340–2357; DX 112). The experimental character of Dow's planned use of this material is clear in the record (PX 112).

88. On October 2, 1951, Bradt supplied an experimental quantity of 15 pounds of his injection molding compound to Service Plastics Inc., a Chicago injection molder (DX 110). The evidence failed to support DuPont's contention that Bradt supplied additional quantities of this material to Service Plastics during 1951 (T 2190–2191; Ka-

rels Deposition, pp. 10–11, 39–44, 50–56; DX 110).

89. Bradt supplied a quantity of his injection molding compound to the Koppers Company for the specific purpose of experimentation and evaluation (T 1916–1924; PX 190A, PX 190C, PX 190D; DX 81, DX 82). Not until March 1952, after Koppers had tested Bradt's injection molding compound, was the possibility of producing commercial quantities first considered (PX 190D).

90. The remaining instance in which Bradt supplied any of his molding compound more than one year before he filed his patent application was a 20 pound shipment to the P. R. Mallory in October, 1951. The records of this transaction specifically indicate that the material was to be used only for experimentation (T 2215–2216; DX 111).

91. In no other instance did Bradt supply any quantity of the injection molding compound which is claimed in the Bradt patent more than one year before the filing date of the application (T 280–284, 2094–2096, 2159–2163, 2165, 2176–2181, 2186–2187, 2241–2243, 2269–2275, 2283–2284, 2293–2295, 2303–2322; PX 157A–PX 157B, PX 157H, PX 157U, PX 157Y, PX 157AA, PX 192A, PX 192B, PX 197, PX 205–PX 210; DX 92, DX 94, DX 95A, DX 95D, DX 96, DX 96A, DX 98, DX 99, DX 103, DX 108).

92. The transactions and offers to supply the injection molding compound claimed in the Bradt patent, which took place before January, 1952 when Victory Plastics first tested the compound in an injection molding machine, were not made for any commercial purpose but in furtherance of Bradt's efforts to establish the workability of his concept and thereby to complete his invention. Such activities were within the ambit of experimentation and development which is permitted under 35 U.S.C. § 102(b).

VII. THE FRAUD DEFENSE

93. DuPont has asserted that Bradt intentionally withheld material facts from the Patent Office relating to the

1951 transaction with Victory Plastics and that but for such conduct the application would have been rejected under 35 U.S.C. § 102(b). However, the file history of the Bradt patent clearly shows that this transaction was brought to the attention of the examiner (PX 2, pp. 48–53, 66–67, 90–92).

94. No fraudulent or deceptive intent on the part of Bradt has been demonstrated. He disclosed to the Patent Office all of the relevant information he was able to find at that time after having searched his records (T 1894–1898, 2146–2147; PX 123).

95. Additional evidence relating to the Victory Plastics transaction was discovered just prior to the trial of this action. This newly available evidence taken together with the facts presented to the Patent Office, demonstrates that the Victory Plastics transaction was entirely experimental in nature.

## VIII. INFRINGEMENT

96. DuPont markets three types of glass-reinforced injection molding compounds known in the trade as "Delrin", "Alathon" and "Zytel" (PX 215, Interrogatory 2(a)).

97. Prior to trial, the parties exchanged genuine samples of their respective molding compounds and Dart adduced proofs of infringement with respect to seven of DuPont's products which were representative of its entire product line in terms of resins and glass content (T 75–76, 90–91, 212–216, 282–283; PX 4A–PX 10A).

98. All DuPont's accused products are "injection molding compounds" as recited in claims 1, 8 and 9 of the Bradt patent (T 676–679, 681; PX 44; PX 215, Interrogatory 66(c)–(d)).

99. All DuPont's accused products are "granules of approximately $\frac{1}{16}$ to $\frac{1}{8}$ inch in diameter as recited in claims 1, 8 and 9 of the Bradt patent (T 692–697; PX 44; PX 215, Interrogatory 2(e)).

100. All DuPont's accused products contain "about 15 to 60 percent by weight glass filaments" as recited in claims 1, 8, and 9 of the Bradt patent (T 698–701; PX 44, PX 215; Interrogatory 2(c)).

101. All DuPont's accused products contain glass filaments which are "coated with a thermoplastic molding composition" as recited in claims 1, 8, and 9 of the Bradt patent (T 672–673, 675, 677, 680–681; PX 44, PX 215; Interrogatories 1, 2(a)).

102. All DuPont's accused Zytel products contain glass fibers which are coated with a "polymerized sizing compound" as recited in claim 1 of the Bradt patent (T 704–707; PX 44, PX 215; Interrogatories 48(a)–(c); Admission Requests 34–36).

103. All DuPont's accused Alathon products contain glass filaments which are coated with a "thermosetting plastic composition" as recited in claim 8 of the Bradt patent (T 705; PX 44, PX 215; Interrogatories 48(a)–(c)).

104. All DuPont's accused Delrin products contain glass filaments which are not coated with a sizing compound (T 703, 4097–4100; PX 215; Interrogatories 48(a)–(c)). However, claim 9 of the Bradt patent does not require the use of sizing on the glass (T 703–704; PX 44).

105. All DuPont's accused products are "elongated granules" which contain "generally parallel" glass filaments extending "longitudinally of the granule" as recited in claims 1, 8, and 9 of the Bradt patent (T 92–93, 95–114, 120–152, 198–209, 269–270, 614–616, 682–692, 695–697, 896–903, 3359, 3390–3393, 3814–3824, 3930–3931, 4640–4648; PX 2, pp. 121–122; PX 4A–PX 10E, PX 18, PX 20, PX 43, PX 215, Int. 2(e), PX 244A, PX 269, PX 270, PX 270C, PX 297, PX 297A, PX 297C).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter of this action.

2. Plaintiff, Dart Industries Inc. is the owner of the Bradt Patent No. 2,877,501 involved in this action.

3. Claims 1, 8, and 9, of the Bradt patent are valid under the provisions of the Patent Laws, Title 35, United States Code.

4. Claims 1 and 9 of the Bradt patent have been and are being infringed by defendant DuPont's manufacture, use and/or sale of its glass-reinforced "Zytel" nylon injection molding compounds.

5. Claims 8 and 9 of the Bradt patent have been and are being infringed by defendant DuPont's manufacture, use and/or sale of its glass-reinforced "Alathon" polyethylene injection molding compounds.

6. Claim 9 of the Bradt patent has been and is being infringed by defendant DuPont's manufacture, use and/or sale of its glass-reinforced "Delrin" polyacetal injection molding compounds.

7. A regularly issued patent is presumed to be valid. 35 U.S.C. § 282. Such presumption of validity can be overcome only by strong and convincing proof. Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163 (1939); Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L. Ed. 983 (1937); Eversharp, Inc. v. Fisher Pen Co., 204 F.Supp. 649, 671 (N.D.Ill.1961); Allied Research Products, Inc. v. Heatbath Corp., 300 F.Supp. 656 (N.D.Ill.1969).

8. The presumption of validity is more difficult to overcome when the defendant fails to proffer art more pertinent than that considered by the Patent Office. Hazeltine Research v. Admiral Corp., 87 F.Supp. 72, 78 (N.D.Ill. 1949), aff'd, 183 F.2d 953 (7th Cir. 1950), cert. denied, 340 U.S. 896, 71 S. Ct. 239, 95 L.Ed. 650 (1950); Ransburg Electro-Coating Corp. v. Nordson Corporation, 293 F.Supp. 448 (N.D.Ill.1968); Bela Seating Company Inc. v. Poloron Products, Inc., 297 F.Supp. 489, 507 (N. D.Ill.1968); AMP Inc. v. Vaco Products

Co., 280 F.2d 518, 521 (7th Cir. 1960); Leach v. Rockwood & Co., 404 F.2d 652 (7th Cir. 1968).

9. Utility, within the meaning of the Patent Laws means that the object of the patent is capable of performing some beneficial function claimed for it. Seymour v. Osborne, 78 U.S. 516, 20 L.Ed. 33 (1871); Smith v. Nichols, 88 U.S. 112, 22 L.Ed. 566 (1875); National Slug Rejectors v. A. B. T. Mfg. Corporation, 164 F.2d 333, 335 (7th Cir. 1947), cert. denied, 333 U. S. 832, 68 S.Ct. 459, 92 L.Ed. 1116 (1948); Amphenol Corporation v. General Time Corporation, 397 F.2d 431, 438 (7th Cir. 1968). Moreover, doubts relating to utility are resolved against an infringer. Western Electric Co. v. La Rue, 139 U.S. 601, 11 S.Ct. 670, 35 L.Ed. 294 (1891); Seymour v. Ford Motor Co., 44 F.2d 306, 308 (6th Cir. 1930); Panduit Corporation v. Stahlin Bros. Fibre Works, Inc., 298 F.Supp. 435, 442 (W.D.Mich.1969), aff'd, 430 F. 2d 221 (6th Cir. 1970), cert. denied, 401 U.S. 939, 91 S.Ct. 932, 28 L.Ed.2d 218 (1971).

10. A prior patent or publication to constitute an anticipation under 35 U.S.C. § 102 must bear within its four corners adequate directions for the practice of the patent invalidated. If such earlier disclosure offers no more than a starting point for further experimentation, if its teaching will only sometimes succeed, or if it does not inform the art, without more, how to practice the new invention, it has not enriched the store of common knowledge and is not an anticipation. Allied Research Products, Inc. v. Heatbath Corp., *supra,* 300 F.Supp. at 657.

11. The evaluation of the obviousness or nonobviousness of a claimed invention as required by 35 U.S.C. § 103 is to be made against the background of the following factual determinations: (1) the scope and content of the prior art; (2) the differences between the prior art and the claimed invention; and (3) the level of ordinary skill in the

pertinent art. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L. Ed.2d 545 (1966).

12. Certain secondary considerations may be relevant indicia of the non-obviousness of the claimed invention. Graham v. John Deere Co., *supra.* Such considerations include: (1) Commercial success of the invention. Jones Knitting Corp. v. Morgan, 361 F.2d 451 (3d Cir. 1966); Continental Can Co. v. Anchor Hocking Glass Corp., 362 F.2d 123, 124 (7th Cir. 1966). (2) Unsuccessful efforts of others to produce the products of the invention. Ekco Products Co. v. Chicago Metallic Mfg. Co., 321 F.2d 550 (7th Cir. 1963). (3) Skepticism and doubt of others skilled in the art as to the operability of the inventive concept. United States v. Adams, 383 U.S. 39, 52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Skil Corp. v. Cutler-Hammer, Inc., 412 F.2d 821, 824 (7th Cir. 1969).

13. Disclosures in prior art foreign patents are to be strictly construed and confined to that which they clearly and definitely disclose, without alteration. Nordberg Mfg. Co. v. Woolery Machine Co., 79 F.2d 685, 687 (7th Cir. 1935); Eversharp Inc. v. Fisher Pen Co., *supra,* 204 F.Supp. at 671; Allied Research Products, Inc. v. Heatbath Corp., *supra,* 300 F.Supp. at 657.

14. Prior paper patents have little, if any, weight on the question of non-obviousness as distinguished from anticipation. Wahl Clipper Corporation v. Andis Clipper Co., 66 F.2d 162, 165 (7th Cir. 1933); Holstensson v. Webcor, Inc., 150 F.Supp. 441, 446–7 (N.D.Ill. 1957); Eversharp, Inc. v. Fisher Pen Co., *supra,* 204 F.Supp. at 671.

15. Prior unappreciated and unrecognized results are insufficient in law to invalidate an otherwise valid patent. This is especially true where the patented result was not necessary for the prior art purposes, but purely a matter of chance and not the inherent or inevitable result of the prior method. Tilghman v. Proctor, 102 U.S. 707, 711–

712, 26 L.Ed. 279 (1880); International Nickel Co. v. Ford Motor Co., 166 F. Supp. 551, 559–560, 562 (S.D.N.Y.1958); Allied Research Products, Inc. v. Heatbath Corp., *supra,* 300 F.Supp. at 657.

16. A patent specification complies with the provisions of 35 U.S. C. § 112 if it sets forth a full, clear description of the best mode contemplated by the inventor of carrying out his invention.

17. A patent is not confined to the particular embodiment of the invention which is described as the best mode contemplated, since the claims of the patent, not its specification, measure the invention. Having described his invention and shown its principle, a patentee is deemed to claim every form in which his invention may be copied. Smith v. Snow, 294 U.S. 1, 11, 55 S.Ct. 279, 79 L.Ed. 721 (1934); Eversharp, Inc. v. Fisher Pen Co., *supra,* 204 F. Supp. at 672.

18. The specification of the preferred embodiment cannot be construed as a limitation upon the claims of a patent, unless it is specifically incorporated therein. LaSalle Street Press, Inc. v. McCormick & Henderson, Inc., 292 F. Supp. 276, 280 (N.D.Ill.1968), modified on other grounds, 445 F.2d 84 (7th Cir. 1971).

19. Claims are to be construed in the light of the specification and both are to be read with a view to ascertaining the invention. Proceedings before the Patent Office should be considered in determining the scope of the claims. Graham v. John Deere Co., *supra,* 383 U.S. at 33, 86 S.Ct. 684; United States v. Adams, *supra,* 86 S.Ct. 708 at 49.

20. A patentee can choose his own terms and use them as he wishes so long as he remains consistent in their use and makes their meaning reasonably clear. Universal Oil Products Co. v. Globe Oil and Refining Co., 137 F.2d 3, 6 (7th Cir. 1943), aff'd, 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944); El-

lipse Corp. v. Ford Motor Co., 452 F.2d 163, 167, rehearing denied (7th Cir. 1971).

21. Amendments to claims which are required only to overcome a difficulty in the particular wording or to correct a formal defect, rather than to overcome a prior art rejection, do not alter the scope of the claims. Such claims are construed just as they were prior to the amendment. Ellipse Corp. v. Ford Motor Co., *supra* at 168.

22. The scope of a patent claim which does not require amendment to distinguish over prior art remains unaffected by arguments made with respect to other claims elsewhere in the file history. LaSalle Street Press, Inc. v. McCormick and Henderson, Inc., *supra*, 292 F.Supp. at 280–281.

23. The fact that the Patent Office permitted an amendment to be entered necessarily means that it did not consider such amendment as "new matter" within the meaning of 35 U.S.C. 132. Since the Patent Office is constantly determining and defining what is new matter, its rulings on such questions are entitled to special weight. Helms Products v. Lake Shore Manufacturing Co., 227 F.2d 677, 679 (7th Cir. 1955); Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Systems Co., 169 F.Supp. 1, 21 (E.D.Pa.1958), aff'd, 268 F.2d 395 (3d Cir. 1959), cert. denied, 361 U.S. 894, 80 S.Ct. 190, 4 L.Ed.2d 151 (1959).

24. Claims 1, 8, and 9 of the patent in suit define a useful and novel invention within the meaning of 35 U.S.C. §§ 101 and 102.

25. None of the prior art cited by defendant is more pertinent to the validity of claims 1, 8, and 9 of the patent in suit than the references cited by the Patent Office.

26. None of the prior art cited by defendant, taken either alone or in combination, in any way negatives the validity or affects the scope of claims 1, 8, and 9 of the patent in suit.

27. The invention defined by claims 1, 8, and 9 of the patent in suit was not obvious within the meaning of 35 U.S.C. § 103.

28. The specification and claims 1, 8, and 9 of the patent in suit comply fully with the requirements of 35 U.S.C. § 112.

29. 35 U.S.C. § 102(b) provides that an inventor may not obtain a patent for an invention which was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States. . . . ."

30. A prior public use conducted for experimental purposes does not invoke the invalidating effect of 35 U.S.C. § 102(b) for it is in the interest of the public, as well as the inventor, that an invention be perfect and properly tested before a patent is granted on it. Elizabeth v. Pavement Co., 97 U.S. 126, 134–137, 24 L.Ed. 1000 (1877).

31. A use which is not secret or confidential is not necessarily a "public use" under the statute if it is determined to be for experimental purposes. Cloud v. Standard Packaging Corp., 376 F.2d 384, 390 (7th Cir. 1967).

32. A sale or an offer to sell made prior to the time when the experimental stage has been passed, the invention reduced to practice and manufactured in its perfected form, is not a "prior use" or placing of the invention "on sale" within the meaning of 35 U.S. C. § 102(b). Wende v. Horine, 225 F. 501, 505 (7th Cir. 1915); Cline Electric Mfg. Co. v. Kohler, 27 F.2d 638, 641 (7th Cir. 1928).

33. Where an inventor does not have the means to determine the feasibility of his invention and must rely for this purpose upon a third party over whom he has no control, the intent of the third party, be it experimental or commercial, controls. This principle applies unless the inventor has sold his patented device in the ordinary course of his business for a predominantly commercial purpose. Cali v. Eastern Airlines, Inc., 442 F.2d 65, 69–70 (2d Cir. 1971).

34. If an article which embodies the invention is not on hand, ready for delivery, it cannot be said to be "on sale" within the meaning of the statute. The important factor to be considered is whether or not the public was using or being given the present opportunity to use the invention. Burke Electric Co. v. Independent Pneumatic Tool Co., 234 F. 93 (2d Cir. 1916), cert. denied, 241 U.S. 682, 36 S.Ct. 728, 60 L.Ed. 1234 (1916); Sturtevant Co. v. Massachusetts Hair & Felt Co., 124 F.2d 95, 97 (1st Cir. 1941), cert. denied, 315 U.S. 823, 62 S.Ct. 917, 86 L.Ed. 1219 (1942); Connecticut Paper Products, Inc. v. New York Paper Co., 39 F.Supp. 127, 133 (D.C.Md.1941), modified on other grounds, 127 F.2d 423 (4th Cir. 1942); F. E. Myers & Brother Co. v. Goulds Pumps, 91 F.Supp. 475, 497, modified on other grounds, 92 F.Supp. 184 (W.D.N.Y.1950); Johnson & Johnson v. Kendall Company, 215 F.Supp. 124, 131 (N.D.Ill.1963), rev'd on other grounds, 327 F.2d 391 (7th Cir. 1964).

35. Where a use is otherwise experimental in purpose, receipt of payment by the inventor incident to such use, even if such payment results in a profit, does not change the character of the use. Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 256, 8 S.Ct. 122, 31 L.Ed. 141 (1887).

36. The defense of prior public use and on sale of an invention more than one year prior to the filing date of the application must be proven beyond a reasonable doubt. Adler Enterprises, Inc. v. Carson, Pirie, Scott & Co., 218 F.Supp. 325, 330 (N.D.Ill.1963); Connecticut Paper Products, Inc. v. New York Paper Co., supra, 39 F.Supp. at 133.

37. The invention recited in claims 1, 8, and 9 of the patent in suit was not "in public use or on sale" in the United States more than one year before the filing of the application for the patent in suit.

38. In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If the accused matter falls clearly within the claim, infringement is made out and that is the end of it. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Ransburg Electro Coating Corp. v. Nordson, supra at 480.

39. A patent claim which recites a product and which contains no limitations concerning the method by which the product is made shall not be construed to cover only a product made by the process disclosed in the patent. Where the accused product corresponds to the patented article as recited in the claims, it makes no difference with respect to the issue of infringement by what path or process, new or old, inferior or improved, the accused product is manufactured. G. D. Searle & Co. v. Byron Chemical Company, 223 F.Supp. 172, 174 (E.D.N.Y.1963); Johnson & Johnson v. Kendall Company, supra, 215 F.Supp. at 144.

40. Defendant's counterclaim and affirmative defenses were based on allegations having no foundation in fact, and no substantial evidence in support thereof was introduced at trial.

41. All matters regarding damages are reserved for the taking of an accounting as a basis for a money judgment herein. The court in a separate decree, entered simultaneously herewith, is providing for the appointment of a Special Master to hold hearings, take evidence and make a recommendation as to the amount of damages due plaintiff herein.

42. Plaintiff is entitled to its costs to date in this action, said costs to be taxed by the Clerk of the Court.

43. Defendant should be permanently restrained and enjoined from manufacturing, using or selling said Alathon, Zytel or Delrin glass-reinforced injection molding compounds or other glass-reinforced injection molding compounds embodying the invention of said United States Patent No. 2,877,501, or from directly or indirectly infringing said pat-

ent, or from in any way infringing the rights of plaintiff under said patent during the life of said patent.

## DECREE

This action having been tried by the court without a jury and the court having considered the evidence, the exhibits, the record and all the papers and proceedings had herein, and the court having this day simultaneously herewith entered its Findings of Fact and Conclusions of Law.

It is Ordered, Adjudged and Decreed:

1. United States Patent No. 2,877,-501 granted March 17, 1959, is good and valid in law as to all claims thereof.

2. Defendant has infringed upon Claims 1 and 9 of said patent by the manufacture, use and/or sale of its glass-reinforced Zytel injection molding compound.

3. Defendant has infringed upon Claims 8 and 9 of said patent by the manufacture, use and/or sale of its glass-reinforced Alathon injection molding compound.

4. Defendant has infringed upon Claim 9 of said patent by the manufacture, use and/or sale of its glass-reinforced Delrin injection molding compound.

5. Defendant's Amended Counterclaim that said patent be declared invalid, void, unenforceable and not infringed by Defendant is hereby dismissed with prejudice.

6. Defendant is hereby permanently restrained and enjoined from manufacturing, using or selling said Alathon, Zytel or Delrin glass-reinforced injection molding compounds or other glass-reinforced injection molding compounds embodying the invention of said United States Patent No. 2,877,501, or from directly or indirectly infringing said patent, or from in any way infringing the rights of Plaintiff under said patent during the life of said patent.

7. This case is referred to JOSEPH N. DUCANTO as a Special Master of the Court to take and state an account as to the amount of damages plaintiff has suffered from the infringement found herein. Said Special Master is hereby authorized to give oaths, to take oral and documentary evidence and to rule on the admissibility of evidence. He shall file his report and recommendations with the court as speedily as possible after the parties have presented evidence in support of their respective positions. The costs and expenses of the taking of said accounting and the fees of the Special Master, after approval by the court, shall be taxed as costs against defendant.

8. Plaintiff is hereby awarded its costs to date in this action, said costs to be taxed by the Clerk of the Court.

9. The court retains jurisdiction of this case for the purpose of enforcing this decree, ascertaining the damages due plaintiff and entering and enforcing judgment therefor.

10. This decree is final in all other respects, more particularly upon the issue of the validity and infringement of the patent herein.